**630**

NATIONAL ASSOCIATION OF REGU-
LATORY UTILITY COMMISSION-
ERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

American Telephone and Telegraph
Company, the National Association of
Business & Educational Radio, Inc.,
General Electric Company, the Special
Industrial Radio Service Assn., Inc.,
the Central Committee on Telecommu-
nications of the American Petroleum
Institute, Utilities Telecommunications
Council, North Carolina Utilities Com-
mission, South Carolina Public Service
Comm., the People of the State of Cal-
ifornia and the Public Utilities Com-
mission of State of California, Inter-
venors.

NATIONAL ASSOCIATION OF RA-
DIOTELEPHONE SYSTEMS,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of Amer-
ica, Respondents, The National Assn.
of Business & Educational Radio, Inc.,
A. T. & T. Inc., General Electric Co.,
Special Industrial Radio Service Assn.,
Inc., Motorola, Inc., and Airsignal In-
ternational, Inc., Intervenors.

ILLINOIS ASSOCIATION OF RADIO-
TELEPHONE SYSTEMS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of Amer-
ica, Respondents, American Telephone
and Telegraph Company, National As-
sociation of Business & Educational
Radio, Inc., and General Electric Com-
pany, Intervenors.

RAM BROADCASTING COMPANY,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

National Association of Business and
Educational Radio, Inc., and General
Electric Company, Intervenors.

Nos. 74–1555, 74–1585, 74–1659, 74–1696.

United States Court of Appeals,
District of Columbia Circuit.

Argued 12 Sept. 1975.

Decided 5 Jan. 1976.

Kenneth E. Hardman, Washington, D. C., with whom Paul Rodgers, Washington, D. C., was on the brief for petitioner in No. 74–1555.

Abe Fortas, Washington, D. C., for petitioner in No. 74–1585.

John E. Ingle, Counsel, F.C.C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Acting Associate Gen. Counsel, F.C.C. and Carl D. Lawson, Atty., Dept. of Justice, were on the brief for respondents. Joseph Marino, Associate Gen. Counsel, F.C.C., at the time the record was filed, also entered an appearance for respondent F.C.C. Howard E. Shapiro, and Roger B. Andewelt, Attys., Dept. of Justice, entered an appearance for respondent, United States of America in Nos. 74–1555 and 74–1585.

John P. Bankson, Jr., Washington, D. C., for intervenor National Ass'n of Business and Educational Radio, Inc.

Louis Schwartz, Robert A. Woods and Lawrence M. Miller, Washington, D. C., were on the brief for petitioner in No. 74–1659.

James A. Koerner, Washington, D. C., was on a statement filed in lieu of a brief, for petitioner in No. 74–1696.

Charles A. Horsky, Charles Lister, Washington, D. C., Alfred C. Partoll and F. Mark Garlinghouse, New York City, were on the brief for intervenor American Telephone and Telegraph Co. in Nos. 74–1555—74–1585 and 74–1659. Michael Boudin, Washington D. C., also entered an appearance for intervenor American Telephone and Telegraph Co.

Wayne V. Black and Larry S. Solomon, Washington, D. C., were on the brief for intervenor Special Industrial Radio Service Ass'n, Inc., in Nos. 74–1555 and 74–1585.

Joseph E. Keller, Wayne V. Black and Larry S. Solomon, Washington, D. C., were on the brief for intervenor The Central Committee on Telecommunications of the American Petroleum Institute in No. 74–1555.

Charles M. Meehan and Peter M. Nemkov, Washington, D. C., were on the brief for intervenor, Utilities Telecommunications Council.

Edward B. Hipp and Robert F. Page, Raleigh, N. C., were on the brief for intervenor North Carolina Utilities Commission.

Richard D. Gravelle, J. Calvin Simpson and Randolph W. Deutsch, San Francisco, Cal., were on the brief for intervenors State of California and the Public Utilities Commission of the State of California.

Frederick M. Rowe, John L. Bartlett and John B. Wyss, Washington, D. C., were on the brief for intervenor Motorola, Inc., in No. 74–1585.

Joseph M. Kittner and Edward P. Taptich, Washington, D. C., entered appearances for intervenor General Electric Co.

Robert E. Conn and Thomas J. McCabe, Washington, D. C., entered appearances for intervenor Airsignal International, Inc., in No. 74–1585.

M. John Bowen, Jr., Columbia, S. C., entered an appearance for intervenor South Carolina Public Service Commission in No. 74–1555.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioners seek review of a two-part 1975 F.C.C. Memorandum Opinion and Order[1] (hereinafter 1975 Order), filed in a rulemaking proceeding of which notice was first given in 1968.[2] The Order under review adopts the basic approach, with some modification, of a Second Report and Order,[3] (hereinafter 1974 Or-

---

1. *Land Mobile Service,* Docket No. 18262, 51 F.C.C.2d 945 (19 March 1975); *Land Mobile Service,* Docket No. 18262 (16 July 1975) (Proceeding terminated) (J.A. at 537–540).

2. Notice of Inquiry and Notice of Proposed Rule Making, *Land Mobile Use of 806–960 MHz Band,* Docket No. 18262, 14 F.C.C.2d 311 (17 July 1968).

3. *Land Mobile Radio Service,* Docket No. 18262, 46 F.C.C.2d 752 (1 May 1974).

der), which issued after two rounds of comment had been received. This Court has jurisdiction to review the Orders under 47 U.S.C. § 402 (1970) and 28 U.S.C. § 2342 (1970).

The Orders under review deal with the allocation of frequency spectrum, in the 806–921 MHz band, to the land mobile radio service, and with the development of regulations pertaining to the future use of that spectrum. Land mobile radio services are radio communication services, based on land, where either the transmitting or receiving station is mobile.[4]

Such services are of two general types. Public services are operated by common carrier licensees and made available to members of the public. The most common type of public services are radio telephone services which interconnect with existing telephone systems. Private services apparently include all other mobile radio operations, *i. e.,* those not subject to common carrier regulation. They are predominantly dispatch services such as those operated by police departments, fire departments, and taxicab companies, for their own purposes. However, they are not limited to services which an operator provides only to itself, but also extend to services provided to a limited group of users by third party operators.

The 1974 Order, as modified by the 1975 Order, embodies three distinct actions. First, it allocates a total of 40 MHz on the 900 MHz band (825–845 MHz and 870–890 MHz) to the development of a nationwide, broad-band "cellular" mobile radio communications system. (Initially, the Commission intends to authorize use of the minimum spectrum needed for developmental systems.)[5] Through the use of expensive and sophisticated new technologies, the cellular system will make possible more traffic intensity per unit of spectrum than do present mobile communication methods. When operative, which will not be before 1978, it is expected greatly to increase capacity for mobile communications in urban areas over what is now available. The cellular system is clearly a public, common carrier system, and will serve primarily to expand the capacity of radio telephone service.

The 1974 Order limited the group of eligible applicants for licenses to operate on these bands, to wireline (telephone) carriers.[6] The 1975 Order removed this limitation and extended eligibility to radio common carriers as well.[7] Any applicant for a license will nonetheless be required to demonstrate that it has the resources and technology for rapid development of a cellular system.[8] As well as providing radio telephone service, cellular systems are to be allowed to engage in dispatch operations.[9]

Second, 30 MHz (806–821 MHz and 851–866 MHz) is allocated to private services, to be licensed to operators in the Public Safety, Industrial and Land Transportation areas, as authorized under 47 C.F.R. §§ 89, 91, 93. Thus, under existing regulations, this allocation makes available additional spectrum for eligible applicants who wish to obtain a license to operate a station, either for their own private purposes, or, with several other eligibles, on a non-profit, cost-sharing basis.[10] In addition, the Orders would create a new category of private mobile operators, eligible for licensing on the 30 MHz presently being allocated. This new category of operators, known as Specialized Mobile Radio Systems (SMRS), would operate on a. commercial basis to provide service to third parties. Licensing is to be on a first-come, first-served basis, with SMRS applications

---

**4.** 47 C.F.R. § 2.1 (1974).

**5.** 46 F.C.C.2d at 761.

**6.** *Id.* at 760.

**7.** 51 F.C.C.2d at 953.

**8.** *Id.* at 955.

**9.** *Id.* at 952, 46 F.C.C.2d at 761.

**10.** 47 C.F.R. § 89.604 (1974).

treated no differently ·than those of other private applicants.[11] Because it seeks to utilize a profit motive to speed development and refinement of mobile radio technologies, the Commission concludes that SMRS should not be subject to the common carrier regulations of Title II of the Communications Act,[12] and that state certification of SMRS should be preempted.[13]

Third and last, the 1975 Order designates the remaining 45 MHz of the total 115 MHz allocation for reserve and future growth.[14] This aspect of the Order is not challenged in this proceeding.

## I. 40 MHz Allocation for the Creation of Cellular Systems

The power to make this allocation of spectrum for the development of sophisticated and band-efficient cellular systems arises, if at all, under 47 U.S.C. § 303(c) and (g) (1970).[15] Section 303 sets forth the Commission's power and duties in the regulation of radio, and states that the exercise of all powers should be guided by the requirements of "public convenience, interest, or necessity."

The authorizations of powers under subpart (c) to assign bands of frequencies to various classes of stations, and under subpart (g) to provide for experimental uses and encourage the more effective use of radio, appear on their face to justify the allocation at issue here. However, it has been challenged on a variety of grounds, as exceeding the discretion allowed the Commission under the public convenience, interest or necessity standard.

First, the argument is made that the allocation is excessive in light of both the technological requirements for the development of cellular systems, and the extent of need which the system will ultimately satisfy. It appears there is substantial uncertainty as to how much spectrum will be necessary or desirable for the functioning of cellular systems, which are now in the developmental stage at least three years away from operation. In its tentative First Report, which preceded the 1974 and 1975 Orders now under review, the Commission proposed an allocation of 75 MHz.[16] After substantial negative comment was received, including reports by the Department of Justice[17] and the Office of Telecommunications Policy,[18] the conclusion was reached in the 1974 Order to reduce the allocation to 40 MHz.[19]

AT & T, which initially proposed the cellular system and is the company now most deeply involved in its development, argued in response to that Order for an increase of the allocation to 64 MHz. It argued that the proposed reduction to 40 MHz would substantially increase the implementation cost of "attractive" design features then under development.[20]

---

11. 51 F.C.C.2d at 956–57.

12. 46 F.C.C.2d at 762.

13. 51 F.C.C.2d at 974.

14. *Id.* at 946.

15. 47 U.S.C. § 303(c) and (g) (1970) provides:

    Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

    \* \* \* \* \* \*

    (c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

    \* \* \* \* \* \*

    (g) Study new uses for radio, provide for experimental uses of frequencies, and gener-

ally encourage the larger and more effective use of radio in the public interest.

16. First Report and Order, *Spectrum Space for Land Mobile Services,* Docket No. 18262, 19 Pike & Fischer R.R.2d 1663, 1664 (1970).

17. Letter (undated) from the Assistant Attorney General, Antitrust Division, U. S. Department of Justice (hereinafter Justice Dept. Report). (J.A. at 345–353).

18. Letter dated 17 August 1973, from the Director, Office of Telecommunications Policy, and enclosed comments (hereinafter OTP Report). (J.A. at 328–44).

19. 46 F.C.C.2d at 756.

20. 51 F.C.C.2d at 948.

At the other extreme, the Report of the Office of Telecommunications Policy, written in 1973, concludes that 14 MHz should be adequate for the development of a cellular system to meet projected mobile telephone needs.[21]

The Orders under review reveal that the Commission has given serious consideration to the arguments raised as to the extent of the allocation.[22] They reveal also that the determination of how much band width to allocate to cellular systems is at once a highly technical and somewhat speculative undertaking. The amount of spectrum that is appropriate depends upon an estimate of the nature and capabilities of technology that is now only partially developed, and upon projected demands for radio telephone service.

We conclude that such determinations are precisely the sort that Congress intended to leave to the broad discretion of the Commission, by imposing a broad public convenience, interest, or necessity standard. In cases of such broad delegations to expert agencies, the standard of review is that of the reasonableness of the conclusions reached.[23] In light of the wide ranging arguments as to appropriate spectrum width, we cannot say that the allocation of 40 MHz to this experimental mobile radio system was either unreasonably large or unreasonably small.

More substantial arguments are raised pertaining to possible anticompetitive effects of the 40 MHz allocation. It is alleged, first that the allocation will prove in effect to be a grant to the Bell system of monopoly power over the urban radio telephone market. Second, it is stated that the authorization of dispatch service (in all but fleet-dispatch capacities)[24] to be performed by cellular systems will result in a substantial impairment of competition in the now highly competitive dispatch market. Both of these results are said to put the Order in violation of the antitrust component of the public convenience, interest or necessity standard.[25]

On the face of the record, there appears to be a significant plausibility to both of these assertions. While the Order provides for separate licensing of individual cellular systems, and no explicit grant of monopoly rights to AT & T is made, there is good reason to believe that AT & T will operate most, if not all, of the cellular systems eventually put in operation. The cellular system was initially proposed by AT & T[26] in response to the Commission's First Notice of Inquiry on this Docket, and AT & T has already made a substantial investment in its development. In spite of the 1975 Order's determination to allow other than wireline carriers to compete for the opportunity to operate cellular systems, the Commission itself still believes that only wireline carriers will be able to demonstrate that they have the re-

---

21. (J.A. at 333). Also, Motorola has argued in some detail that an allocation of 19 MHz would be sufficient. Motorola Reply Comments at 68–84. (J.A. at 245–70).

22. 51 F.C.C.2d at 948; 46 F.C.C.2d at 756–57.

23. *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *S. E. C. v. New England Elec. Sys.,* 390 U.S. 207, 211, 88 S.Ct. 916, 19 L.Ed.2d 1042 (1968); *Gray v. Powell,* 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301 (1941).

24. 51 F.C.C.2d at 952 and n. 16; 46 F.C.C.2d at 761.

25. There is a good deal of authority for the proposition that competitive factors may properly be considered by the Commission under the public convenience, interest or necessity standard. *See United States v. R. C. A.,* 358 U.S. 334, 351, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *F. C. C. v. R. C. A. Comm., Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); *N. B. C. v. United States,* 319 U.S. 190, 223, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *Radio Relay Corp. v. F. C. C.,* 409 F.2d 322, 326 (2d Cir. 1969). *But see Hawaiian Telephone Co. v. F. C. C.,* 162 U.S.App.D.C. 229, 235, 498 F.2d 771, 777 (1974) (F.C.C. may not "automatically equate the public interest with additional competition.").

Whether and to what extent decisions of the Commission are reversible for failure to consider particular factors is much less clear.

26. 46 F.C.C.2d at 753–54.

sources and expertise which are a prerequisite to licensing.[27]

If it is thus true that AT & T is the likely recipient of a virtual monopoly in the operation of cellular systems, this will result in significant increases in its market power, where cellular systems are operative, in two fields apart from traditional wireline communications.

■ First, AT & T appears likely to dominate substantially the field of radio telephone service, which has heretofore been occupied in significant part by small radio common carriers operating in a highly competitive environment.[28] This threat is made more severe by the 1975 Order's elimination of a requirement that wireline operators offer to interconnect radio common carriers into their systems.[29] Such substantial domination would be undesirable both because it would weaken incentives for development of improved mobile radio systems,[30] and because it would enhance the already enormous overall economic power of the Bell System.

Second, AT & T will become a significant force in the now highly competitive market for private dispatch services.[31]

Whether it will be able to dominate that market presently appears difficult to determine. One significant factor is the extent to which AT & T's other communications activities may facilitate its operations in the dispatch market.[32]

■ Although the Commission has included in the 1975 Order certain actions that are designed to minimize possible anticompetitive effects of the Order, it seems likely that they will prove largely cosmetic. These actions do little or nothing to curtail the projected market power of AT & T in either cellular system or dispatch operations. In particular, the 1975 Order requires that separate companies be established for the operation of cellular systems, and that separate account books and payrolls be maintained.[33] This requirement is designed to prevent cross-subsidization of the activities of the cellular system by profits of the parent corporation, as might make possible predatory behavior against radio common carriers or private dispatch operators. However, even perceived most favorably, this action does nothing except attempt to make financially impossible with AT & T capital predatory behavior which is already ille-

---

**27.** 51 F.C.C.2d at 953.

**28.** OTP Report, *supra* note 18, at 8 (J.A. at 337).

**29.** 51 F.C.C.2d at 946. *See* OTP Report, *supra* note 18, at 12 (J.A. at 341); Justice Dept. Report, *supra* note 17, at 7 (J.A. at 351).

This part of the Commission's decision is somewhat puzzling. A substantial anticompetitive impact seems almost inevitable and the Commission has given no justification for dropping the interconnection requirement except to say that such interconnection is "unnecessary" in light of its decision not to license trunked systems. We agree with the original recommendations of the Office of Telecommunications Policy and the Justice Department that nondiscriminatory interconnections must be assured, but await the proof by the results.

**30.** Justice Dept. Report, *supra* note 17, at 2 (J.A. at 346).

**31.** It is unclear whether the authorization to engage in dispatch service is in violation of the

1956 Western Electric consent decree. That decree bars AT & T from engaging "in any business other than the furnishing of common carrier communications services," but excepts from the bar "services incidental to the furnishing . . . of common carrier communications services." *United States v. Western Elec. Co.,* Civ. No. 17–49, 1956 Trade Cas. ¶ 68,246, at 71,138 (D.N.J.1956).

Because of our general disposition of these competitive issues, *see infra,* we reserve for decision in a future case the issues of whether the dispatch services to be carried on by AT & T can be characterized as "common carrier communications services," and if not, whether the dispatch services carried on are "incidental."

**32.** *See* Justice Dept. Report, *supra* note 17, at 6. (J.A. at 350) (asserting that "[t]he advantages adherent in the telephone service monopoly enjoyed by the wireline carriers vis-a-vis potential competitors in other communications services are competitively significant.").

**33.** 51 F.C.C.2d at 951.

gal and subject to prosecution under the antitrust laws.[34]

The 1975 Order also imposes certain restrictions on the manufacture, provision, and servicing of equipment for cellular system operations. Were stringent regulations imposed to exclude wireline operators from these related fields, they might result in other corporations becoming involved in these manufacture and service functions. Even then, however, though they would keep AT & T out of these other fields, they would do nothing to increase competition for licensing of cellular systems, or to improve the competitive situation in the dispatch market.

Even the modest expectation of increasing competition in the manufacture, supply and maintenance of equipment is made doubtful by the narrow scope of the limits imposed by the 1975 Order.[35] First, the restrictions apply only with regard to mobile equipment, and not to the base station equipment now under development by AT & T. There appears to be no substantial expectation that any independent sources for base station equipment will be developed. Second, the 1975 Order eliminated the 1974 Order's bar on supply and maintenance (as distinguished from manufacture) of mobile equipment by wireline carriers, and stated that there would be no automatic bar to use of carrier-manufactured mobile equipment in the developmental systems.[36] The only clear restriction remaining is a general bar on manufacture of mobile equipment by wireline carriers, and that will not have unexceptioned application until the systems become generally operative, which will not be for at least several years.

■■■ In spite of our conclusion that significant anticompetitive effects may well result in the form of AT & T monopolization of cellular operations and impairment of the now highly competitive dispatch market, the court holds that the 40 MHz allocation is not, at this time, a breach of the broad discretion [37] allocated to the Commission under the statute. The anticompetitive effects envisioned above are contingent upon a variety of factors surrounding the development and implementation of cellular technology. Thus far, the Commission has stated its clear intention to authorize only a developmental system in the Chicago area, which will utilize only 12.5 MHz of the 40 MHz allocation. The Commission retains a duty of continual supervision of the development of the system as a whole, and this includes being on the lookout for possible anticompetitive effects.[38] The serious anticompetitive effects, if they arise at all, will do so only after full implementation begins.

We are strongly influenced by the position of the Justice Department in full

---

34. Cutting prices below marginal cost in order to discourage competition is the most blatant form of predatory behavior and, at least where the price cutter holds significant market power, is subject to attack under Sherman Act § 2, 15 U.S.C. § 2 (1970). *E. g., Standard Oil Co. v. United States,* 221 U.S. 1, 43, 31 S.Ct. 502, 55 L.Ed. 619 (1910). *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975).

35. 51 F.C.C.2d at 951–52.

36. *Id.* at 952.

37. The substantial discretion generally allowed the F. C. C. in determining both what and how it can properly regulate, is often attributed to the highly complex and rapidly expanding nature of communications technology. Because Congress could neither foresee nor easily comprehend the fast-moving developments in the field, it "gave the Commission not niggardly but expansive powers." *N. B. C. v. United States,* 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 172–73, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *F. C. C. v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940); *Philadelphia Television Broadcasting Co. v. F. C. C.,* 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966).

38. *See* note 25 *supra.*

support of the proposed F. C. C. Orders.[39] It is true that the Justice Department has expressed reservations about several elements of the 1974 Order, and that the 1975 Order does not fully ameliorate several of Justice's concerns.[40] Nonetheless, the Department is apparently satisfied that the Order as a whole poses no immediate and substantial competitive problems. Their action, like ours, would appear to be based in part on the view that there will be ample opportunity to challenge anticompetitive effects as the time approaches when they will be felt, and the extent of the impact on competition becomes more readily assessable. The Justice Department no doubt will make a continuing assessment.

Our affirmance of the 40 MHz allocation for the development of a cellular common carrier system is with the implicit recognition that it may be subject to successful challenge at some future date. It is the broad statutory power of the Commission to experiment and encourage new uses of radio,[41] coupled with the lack of urgency surrounding the projected anticompetitive effects, which leads us to our conclusion. We do not hold that the projected effects considered above would not constitute a breach of the antitrust component of the public convenience, interest and necessity standard,[42] were they more immediate in time or more susceptible of precise assessment. Nor do we make any com-

ment with regard to the particular applicability of antitrust statutes, which issue is not presently before us.[43]

## II. *30 MHz Allocation for Use by Private Mobile Service, Including a New Class of Entrepreneurial Operators Known as Specialized Mobile Radio Systems (SMRS)*

The aspect of the 30 MHz allocation which is challenged is the authorization of a new category of entrepreneurial mobile operators who will share access to the allocated spectrum with private operators eligible under the Public Safety, Industrial and Land Transportation Radio Services.[44] Private operations involve primarily dispatch services which the operator provides to himself, such as those provided by police departments and taxicab companies. Prior to the present Order, they have also included systems operated on a cooperative basis for the benefit of several affiliated users.[45] The significant action taken under the present Order is the assimilation, with the above operations, of profit-motivated systems by an entrepreneur solely for the use of third party clients.

In authorizing the creation of these entrepreneurial Specialized Mobile Radio Systems (SMRS), the Commission seeks to deal with them precisely as it deals with the more traditionally private mobile operators.[46] Applications of all pri-

---

**39.** Respondent's Brief is filed jointly by the F. C. C. and the Justice Department.

**40.** In particular, the Order authorizes entry of wireline carriers into the dispatch market, and eliminates any requirement that wireline carriers extend non-discriminatory interconnection rights to all providers of land mobile services. *See* Justice Dept. Report, *supra* note 17, at 6, 7 (J.A. at 350–51).

**41.** 47 U.S.C. 303(g) (1970).

**42.** *See* note 7–3 *supra*.

**43.** Under 47 U.S.C. § 313(a) (1970), the antitrust laws are fully applicable to the manufac-

ture, sale and trade in radio apparatus, and to interstate or foreign radio communications.

**44.** *See* 47 C.F.R. §§ 89, 91, and 93 (1974).

**45.** Under 47 C.F.R. § 89.604(a) and (b) (1974) several operators may be separately licensed to use a single system. Such systems, known as "community repeaters," were explicitly approved by the Commission in 1970. Memorandum Opinion and Order, *Multiple Licensing— Safety and Special Radio Services*, Docket No. 18921, 24 F.C.C.2d 510 (15 July 1970).

**46.** 51 F.C.C.2d at 956–57. In processing applications for use of the 30 MHz allocated by this

vate operators including SMRS, are to be processed, up to spectrum capacity, on a first-come, first-served basis.[47] Believing that competition between many operators is the best way to hasten the development of improved technologies, the Commission seeks to treat SMRS, like all other private operators, as non-common carriers, and to pre-empt state regulation of entry.

The non-common carrier classification is the pivot upon which the Commission's scheme for regulating SMRS turns. It makes clearly inapplicable the stringent rate and service regulations of the Title II Common Carrier provisions.[48] Also, it renders inapplicable certain provisions of Title III (Radio Licensing), which require a 30-day waiting period prior to the granting of any application[49] and which guarantee the right to petition for denial of the application.[50] Finally the classification as non-common carriers appears to have certain effects on the power of federal pre-emption, which power the Commission has sought to exercise here by barring state entry regulation.

### A. Classification of SMRS as Non-Common Carriers

#### 1. Statutory Definition of Common Carrier

For purposes of the Communications Act, a common carrier is "any person engaged as a common carrier for hire . . . ."[51] The Commission's regulations offer a slightly more enlightening definition: "any person engaged in rendering communication service for hire to the public."[52] However, the concept of "the public" is sufficiently indefinite as to invite recourse to the common law of carriers to construe the Act.

In seeking an applicable common law definition of common carrier, a good deal of confusion results from the long and complicated history of that concept. Originally, the doctrine was used to impose a greater standard of care upon carriers who held themselves out as offering to serve the public in general. The rationale was that by holding themselves out to the public at large, otherwise private carriers took on a quasi-public character. This character, coupled with the lack of control exercised by shippers or travellers over the safety of their carriage, was seen to justify imposing upon the carrier the status of an insurer.[53]

The late nineteenth century saw the advent of common carriers being subjected to price and service regulations as well. At first challenged as deprivations of property without due process, these early regulations were upheld on the basis of the near monopoly power exercised by the railroads, coupled with the fact that they "exercise a sort of public office" in the duties which they perform.[54]

---

Order, the Commission intends to consider those of commercial enterprises "on the same basis" as those of applicants for "private or shared communication facilities." 47 C.F.R. § 89.803(b) (as amended per 1975 Order, 51 F.C.C.2d at 999).

**47.** 51 F.C.C.2d at 957.

**48.** 47 U.S.C. §§ 201–05 (1970). We do not here hold that the Commission is required to exercise its affirmative Title II powers wherever a common carrier within its jurisdiction is found to exist. We only hold that the language of that Title becomes applicable, and leave to a case presenting that issue the problem of whether Title II powers are mandatory or discretionary.

**49.** 47 U.S.C. § 309(b) (1970).

**50.** 47 U.S.C. § 309(d) (1970). Section (d) applies to the categories set forth in section (b).

**51.** 47 U.S.C. § 153(h) (1970).

**52.** 47 C.F.R. § 21.1 (1974).

**53.** This insurance obligation has never been unexceptioned, and has not extended to acts of God, damages resulting from warfare, or causes beyond the control of the carrier which are expressly excepted in the bill of lading. *Propeller Niagara v. Cordes,* 62 U.S. (21 How) 7, 23, 16 L.Ed. 41 (1858).

**54.** *Munn v. Illinois,* 94 U.S. (4 Otto) 113, 130, 24 L.Ed. 77 (1876). For an historical discussion of the idea that businesses affected with a public interest are subject, on that account, to governmental regulation, see McAllister, *Lord Hale and Business Affected with a Public Interest,* 43 Harv.L.Rev. 759 (1930).

Subsequently, legislation has been upheld imposing stringent regulations of various types on entities found to be affected with a public character, even where nothing approaching monopoly power exists. In such cases as the Motor Carrier Act of 1935,[55] relatively competitive carrying industries have been subjected to entry, rate and equipment regulations on the basis of the quasi-public character of the activities involved.[56]

Whether the common carrier concept is invoked to support strict tort liability or as a justifying basis for regulation, it appears that the critical point is the quasi-public character of the activity involved. To create this quasi-public character, it is not enough that a carrier offer his services for a profit, since this would bring within the definition private contract carriers which the courts have emphatically excluded from it.[57] What appears to be essential to the quasi-public character implicit in the common carrier concept is that the carrier "undertakes to carry for all people indifferently . . . ."[58]

■■ This does not mean a given carrier's services must practically be available to the entire public. One may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the total population. And business may be turned away either because it is not of the type normally accepted or because the carrier's capacity has been exhausted. But a carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal.[59] It is not necessary that a carrier be required to serve all indiscriminately; it is enough that its practice is, in fact, to do so.[60]

This requirement, that to be a common carrier one must hold oneself out indiscriminately to the clientele one is suited to serve, is supported by common sense as well as case law. The original rationale for imposing a stricter duty of care on common carriers was that they had implicitly accepted a sort of public trust by availing themselves of the business of the public at large. The common carrier

---

55. 49 U.S.C. §§ 301–27 (1970).

56. See American Trucking Ass'ns, Inc. v. United States, 101 F.Supp. 710 (N.D.Ala.1951) (upholding the Act against Constitutional challenge.).

57. Home Ins. Co. v. Riddell, 252 F.2d 1 (5th Cir. 1958); Ciaccio v. New Orleans Public Belt R. R., 285 F.Supp. 373 (E.D.La.1968).

58. Semon v. Royal Indemnity Co., 279 F.2d 737, 739 (5th Cir. 1960); Home Ins. Co. v. Riddell, 252 F.2d 1, 3 (5th Cir. 1958); Ciaccio v. New Orleans Public Belt R.R., 285 F.Supp. 373, 375 (E.D.La.1968); State v. Sinclair Pipe Line Co., 180 Kan. 425, 304 P.2d 930, 941 (1957); Utilities Comm. v. Gulf Atlantic Towing Corp., 251 N.C. 105, 110 S.E.2d 886, 889 (1959).

The following cases state the test in similar wording, while not finding that a given carrier was a non-common carrier: Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211, 48 S.Ct. 41, 72 L.Ed. 241 (1927); Terminal Taxicab Co. v. Kutz, 241 U.S. 252, 255, 36 S.Ct. 583, 60 L.Ed. 984 (1916); Grace Line, Inc. v. F. M. B., 280 F.2d 790, 792 (2d Cir. 1960); Arrow Aviation, Inc. v. Moore, 266 F.2d 488, 490 (8th Cir. 1959); Circle Express

Co. v. Commerce Comm., 249 Iowa 651, 86 N.W.2d 888, 893 (1957); State ex rel. Anderson v. Witthaus, 340 Mo. 1004, 102 S.W.2d 99, 102 (1937); Ferguson Trucking Co. v. Rogers Truck Line, 164 Neb. 85, 81 N.W.2d 915, 922 (1957).

The F. C. C. has expressed a similar view of the common carrier concept as applied to communications. "[T]he fundamental concept of a communications common carrier is that such a carrier makes a public offering to provide, for hire, facilities by wire or radio whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing . . . ." Report and Order, Industrial Radiolocation Service, Docket No. 16106, 5 F.C.C.2d 197, 202 (5 October 1966).

59. Semon v. Royal Indemnity Co., 279 F.2d 737, 739–40 (5th Cir. 1960).

60. Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211–12, 48 S.Ct. 41, 42, 72 L.Ed. 241 (1927), ("a common carrier is such by virtue of his occupation, not by virtue of the responsibilities under which he rests."); See Lone Star Steel Co. v. McGee, 380 F.2d 640, 647–48 (5th Cir. 1967).

concept appears to have developed as a sort of *quid pro quo* whereby a carrier was made to bear a special burden of care, in exchange for the privilege of soliciting the public's business.

Moreover, the characteristic of holding oneself out to serve indiscriminately appears to be an essential element, if one is to draw a coherent line between common and private carriers. The cases make clear both that common carriers need not serve the whole public,[61] and that private carriers may serve a significant clientele, apart from the carrier himself.[62] Since given private and common carriers may therefore be indistinguishable in terms of the clientele actually served, it is difficult to envision a sensible line between them which does not turn on the manner and terms by which they approach and deal with their customers. The common law requirement of holding oneself out to serve the public indiscriminately draws such a logical and sensible line between the two types of carriers.

Finally, the holding out prerequisite to common carrier status is not without implicit support in the F. C. C. Regulations themselves. In defining "public correspondence," the Regulations focus upon the element of being at the disposal of the public.[63] Unlike "public correspondence," "private line service" is distinguished by its being set aside for the use of particular customers, so as not to be generally available to the public.[64] This public-private dichotomy is generally regarded as synonymous with the distinction between common carrier and non-common carrier operators.

## 2. Application of Common Carrier Definition to SMRS

In order to overturn the Commission's classification of SMRS as non-common carriers, the Court must find a substantial likelihood that SMRS will hold themselves out to serve indifferently those who seek to avail themselves of their particular services. It is not an obstacle to common carrier status that SMRS offer a service that may be of practical use to only a fraction of the population, nor that the Order limits possible subscribers to SMRS services to eligibles under Sections 89, 91 and 93 of the Regulations.[65] The key factor is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use. In making this determination, we must inquire, first, whether there will be any legal compulsion thus to serve indifferently, and if not, second, whether there are reasons implicit in the nature of SMRS operations to expect an indifferent holding out to the eligible user public.

As to possible regulatory compulsion, there is no indication in the proposed regulations that SMRS are to be in any way compelled to serve any particular applicant, or that their discretion in determining whom, and on what terms, to serve, is to be in any way limited. The application provisions require that SMRS applicants certify that they will not provide service to ineligibles, but say nothing about any obligation to provide services to eligibles who seek them.[66] Nor does the section set-

---

61. *Terminal Taxicab Co. v. Kutz,* 241 U.S. 252, 255, 36 S.Ct. 583, 60 L.Ed. 984 (1927).

62. *Home Ins. Co. v. Riddell,* 252 F.2d 1, 4 (5th Cir. 1958).

63. "Public correspondence. Any telecommunication which the offices and stations, by reason of their being at the disposal of the public, must accept for transmission." 47 C.F.R. § 21.1 (1974).

64. "Private line service. A service whereby facilities for communication between two or

more designated points are set aside for the exclusive use or availability for use of a particular customer and authorized users during stated periods of time." 47 C.F.R. § 21.1 (1974).

65. 47 C.F.R. § 89.604(c) (as amended per 1975 Order, 51 F.C.C.2d at 993).

66. 47 C.F.R. § 89.702(a)(2) (as amended per 1975 Order, 51 F.C.C.2d at 996–97).

ting forth limitations on mode of operation contain any such provision.[67]

Nor is there evidence in the administrative scheme of an implicit intent so to require. The Order evidences a clear intent not to discriminate between any of the types of "private" operators, including SMRS, in the granting of license applications.[68] It would appear that the FCC might have made special provision assuring adequate allocation to SMRS particularly, if SMRS were regarded as performing some public access function not performed by the other types of "private" systems.

Finally, the fact that the same Order provides for performance of dispatch services by cellular common carriers[69] suggests that any Commission concern about free public access to dispatch services may have been dealt with by authorizing dispatch services by common carrier who, due to their general status as common carriers, arguably cannot discriminate against particular users.

Since one may be a common carrier by holding oneself out as such, we must inquire further whether there is good reason to believe that SMRS will in fact serve the user public more or less indifferently, even absent any regulatory compulsion to do so. At the outset it appears that this inquiry must be highly speculative, both because no operating SMRS are now in existence, and because the parties have not addressed in any detail the issue of the prospective SMRS business operations.

The nature of the dispatch services which SMRS will primarily offer appear necessarily to involve the establishment of medium-to-long-term contractual relations, whereby the SMRS supply the needs of users for dispatch facilities for a period of time.[70] In such a situation, it is not unreasonable to expect that the clientele might remain relatively stable, with terminations and new clients the exception rather than the rule. It might even be that the turnover will be sufficiently minor that, except for the commercial mode of operation, SMRS will be much like non-profit community repeaters.[71] "Repeaters" are required on application to submit the names and addresses of all cost-sharing participants,[72] which would seem to indicate a high level of stability among those employing the service.

If the SMRS business is as hypothesized above, and nothing in the briefs or argument indicates otherwise, there would appear to be little reason to expect any sort of holding out to the public at all. Moreover, even as openings arise, there may be many reasons that the operator would desire and expect to negotiate with and select future clients on a highly individualized basis. The operator may be concerned about the personal and operational compatibility of a given applicant vis-a-vis the SMR system as a whole and the other clients already using it. Methods of operation and time demands may be highly individualized and may be a very sound basis for accepting or rejecting an applicant, when considered in light of the methods already being employed and the particular time demands already being put on the system.[73]

■ We therefore conclude that nothing in the record indicates any significant likelihood that SMRS will hold

---

67. 47 C.F.R. § 89.655 (as amended per 1975 Order, 51 F.C.C.2d at 995–96).

68. 47 C.F.R. § 89.803(b) (as amended per 1975 Order, 51 F.C.C.2d at 999).

69. 51 F.C.C.2d at 952.

70. See 47 C.F.R. § 89.702(a)(2)(iii) (as amended per 1975 Order, 51 F.C.C.2d at 997) (making clear that SMRS business will be done under written contract).

71. See note 45 supra.

72. 47 C.F.R. § 89.702(a)(2)(iii) (1974).

73. For example, an operator might be in a position to accept an applicant whose primary needs are between certain hours, but to reject one whose needs are different. See 51 F.C.C.2d at 965–66, for further discussion of the way that different systems may be suited to different users and different user needs.

themselves out indifferently to serve the user public. While it is undisputed that they would be permitted so to hold themselves out if they desired, that is not sufficient basis for imposing the burdens that go with common carrier status. In so holding, we do not foreclose the possibility of future challenge to the Commission's classification, should the actual operations of SMRS appear to bring them within the common carrier definition.

■ Further, we reject those parts of the Orders which imply an unfettered discretion in the Commission to confer or not confer common carrier status on a given entity, depending upon the regulatory goals it seeks to achieve.[74] The common law definition of common carrier is sufficiently definite as not to admit of agency discretion in the classification of operating communications entities. A particular system is a common carrier by virtue of its functions, rather than because it is declared to be so.[75] Thus, we affirm the Commission's classification not because it has any significant discretion in determining who is a common carrier, but because we find nothing in the record or the common carrier definition to cast doubt on its conclusions that

SMRS are not common carriers.[76] If practice and experience show the SMRS to be common carriers, then the Commission must determine its responsibilities from the language of the Title II common carrier provisions.

■ Finally, we reject any implications in the Orders[77] and argument of the Commission that there is any mutual exclusivity of application of the Title II Common Carrier provisions and the Title III provisions pertaining to Radio. It may be true that when enacted, the two titles were seen as applying to two largely discrete realms of activity.[78] Certainly radio technology had not, by 1934, achieved large scale application in the common carriage area, and was largely limited to the broadcast activities which were originally the primary target of Title III. Nonetheless, the language of Title II, from time of first enactment, extended its coverage to common carriage "by wire or radio".[79]

Moreover, the result of a radio operator being held subject to Title II is not to create any conflict with the already applicable provisions of Title III, which basically allow for licensing of transmitting stations in the public interest.[80] It is rather to make additionally applicable

---

74. The strongest statement of this sort is in the 1974 Order:

> We are fully aware . . . that some of the entities we propose to license, i. e., entrepreneur-operated, common-user systems, could be licensed as common carriers and regulated under Title II of the Communications Act. However, our basic goal in this proceeding is . . . to make available to the land mobile service additional spectrum and to do this in a way that would promote the larger and more effective use of this spectrum. . . . In accomplishing this goal, we are free, we believe, to adopt whatever comprehensive regulatory scheme is best suited for the purpose." 46 F.C.C.2d at 763–64. See also 51 F.C.C.2d at 957–59.

75. United States v. California, 297 U.S. 175, 181, 56 S.Ct. 421, 80 L.Ed. 567 (1936); Lone Star Steel Co. v. McGee, 380 F.2d 640, 648 (5th Cir. 1967).

But see Philadelphia Television Broadcasting v. F.C.C., 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966) (upholding F.C.C. classification

of cable T.V. as a non-common carrier: "[D]eference to the agency's interpretation of its governing statute is reinforced where, as here, the legislative history is silent, or at best unhelpful, with respect to the point in question.")

76. The statements of the Order can be made to square with the view of this court, if they are read to mean that the Commission could have treated SMRS as common carriers by imposing on them requirements which would have made them common carriers. Without asserting that this was the Commission's meaning, it is clear that the Commission had discretion to require SMRS to serve all potential customers indifferently, thus making them common carriers within the meaning of the statute.

77. See 46 F.C.C.2d at 763.

78. See IV B. Schwartz, The Economic Regulation of Business and Industry 2374 (1973).

79. 47 U.S.C. § 201 (1970).

80. 47 U.S.C. § 303 (1970).

certain provisions including those dealing with non-discriminatory service and charges,[81] liability for damages,[82] special corporate obligations and duties of common carriers,[83] and right to petition for denial of an application.[84] Therefore, if it is at some time demonstrated that SMRS are actually common carriers, there is nothing in the statute to prevent their regulation under both Titles II and III.

### B. Impact of Non-Common Carrier Status on Federal Regulation

Our decision to uphold the Commission's classification of SMRS as non-common carriers leads directly to the affirmance of the Orders, insofar as they create a scheme of Federal regulation. In essence, the Commission seeks to license SMRS on a first-come, first-served basis, out of a pool which includes, as well, all individual and system-sharing eligibles under 47 C.F.R. §§ 89, 91 and 93. While the Commission expects to pass upon the legal and technical qualifications of applicants, it does not plan to examine their financial qualifications.[85] Most importantly, the Commission intends to leave SMRS free of all federal regulation which would follow as a result of common carrier status.

There is no facial violation of the statute resulting from any of these actions, once the conclusion is reached that SMRS are not common carriers. Obviously, the Title II common carrier provisions are inapplicable, as are certain provisions of Title III which apply only to common carriers.[86]

Also, the provision of 47 U.S.C. § 308(b) authorizing consideration of factors of "citizenship, character, and financial, technical and other qualifications . . . ." is not violated because it does not require scrutiny of an applicant's financial fitness. That section leaves it within the discretion of the Commission to decide which facts relating to such factors it wishes to have set forth in applications. Since this leaves the Commission free to have no facts set forth on any of these matters, if it finds such action appropriate, it follows necessarily that the Commission is not required to consider financial fitness if it deems it irrelevant to its regulatory scheme.[87]

Nor, going beyond the words of the statute, can we conclude that in authorizing the creation of SMRS which are not required to behave and thus be regulated, as common carriers, that the F.C.C. has breached the broad discretion granted it with regard to radio under the "public convenience, interest and necessity" standard. The Commission has concluded that a competitive environment is the best and most feasible way to achieve its goal of most efficient development and use of the 900 MHz band. The 1975 Order reveals an in-depth consideration of the effects of such a competitive approach[88] so that we cannot say that the F.C.C. may not have "given reasoned consideration to each of the pertinent factors."[89]

The allegation of a breach of discretion in failing to give adequate consideration to possible anticompetitive effects is likewise without merit. While it is true that Motorola enjoys substantial domination of the sales market for mobile radio systems, that fact does not confer upon any aspect of the Order a

---

81. 47 U.S.C. §§ 201–05 (1970).

82. 47 U.S.C. §§ 206–09 (1970).

83. 47 U.S.C. §§ 210–12 (1970).

84. 47 U.S.C. § 309(b) and (d) (1970).

85. 51 F.C.C.2d at 957.

86. Sections 309(b), (d), dealing with delay before granting an application and right to petition for denial of an application, apply to several classes of stations, but only the common carrier classification is potentially relevant to SMRS. 47 U.S.C. § 309(b), (d) (1970).

87. 47 U.S.C. § 308(b) (1970). See also 51 F.C.C.2d at 960.

88. 51 F.C.C.2d at 967–71.

89. Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). See Hawaiian Telephone Co. v. F.C.C., 162 U.S.App.D.C. 229, 234–35, 498 F.2d 771, 776–77 (1974).

clear anticompetitive character. Motorola is to be allowed to apply for licensing to operate SMRS. Although the company's longstanding expertise in the field of mobile radio certainly will not impair its efforts to operate such systems, no reason has been made known to us why it should be of any substantial competitive advantage either.[90]

Motorola's substantial size and financial power is, of course, a factor which could discourage competition, especially if most SMRS (and private dispatch) operators are relatively small. However that potential threat arises from economic power alone and not from any of Motorola's mobile radio-related activities. It is a factor which the Commission must keep under scrutiny, and it may give cause at some point for adoption of more exclusive licensing policies. Also, it may provide cause for independent antitrust actions. However, on the present record, no such anticompetitive effects have been shown as would constitute a colorable violation of the antitrust component of the public convenience, interest or necessity standard.[91]

C. *Impact of Non-Common Carrier Status on Aspects of the Order Relating to State Regulation*

The 1975 Order pre-empts possible assertion of state entry certification over SMRS.[92] This action appears reasonably necessary in order to create the atmosphere of free entry and competition which the Commission has determined is desirable as a means of maximizing the development of mobile radio technology.[93] Because we have held above that the Commission's treatment of SMRS, from the standpoint of federal law, is within its broad discretion under Title III, it follows that any state regulation inconsistent with the policy adopted may be pre-empted, unless such pre-emption is explicitly prohibited by statute. Petitioners point to two sections of the Communications Act which they say bar federal pre-emption by denying any Commission jurisdiction over certain areas regulated by the states.

Section 221(b) of Title 47, U.S.C., denies Commission jurisdiction except as provided by § 301, over "telephone exchange service" which is subject to state regulation. While it appears to us that SMRS are not likely to be significantly engaged in "telephone exchange service," and further appears highly arguable that the § 301 licensing power includes the power to draw up comprehensive schemes providing the conditions under which licenses will be granted, we do not dispose of this challenge on these grounds. Rather the context of § 221 within the Title dealing with common carriers, and the section's own reference to "telephone companies" and "telephone exchange service," makes clear that its only application is to common carriers. Since we have upheld the Commission's non-common carrier classification of SMRS, § 221(b) has no application here.

Section 152(b) of Title 47, U.S.C., expresses a similar denial of Commission jurisdiction, except as provided by § 301, over radio or wire carriers whose operations are either intrastate, or interstate or foreign only by interconnection with another carrier with whom it has no interlocking control relationship. Reserving the same question set forth above as to the breadth of the § 301 licensing power, and not conceding that SMRS fit

---

**90.** *See* OTP Report, *supra* note 18, at 11 (J.A. at 340): "We see no justification for excluding mobile radio equipment manufacturers and suppliers from the operation of mobile communications systems, whether multi-user systems for hire or otherwise."

**91.** *See* note 25 *supra*.

**92.** 51 F.C.C.2d at 974. The 1974 Order had pre-empted all state regulation of SMRS operations. In limiting the pre-emption to entry certification, the 1975 Order expresses the hope "that states will follow our lead towards a free, competitive environment for SMR systems . . ." but "defer[s] judgment as to any action by the states relating to regulation of other aspects of SMR operations." *Id.*

**93.** *See Florida Lime & Avocado Growers, Inc., et al v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

within the categories of intrastate and interconnection interstate operations to which the section applies, we again rest our holding on other grounds. Under 47 U.S.C. § 153(h), the term "carrier," as used in § 152(b), is equated with "common carrier." Thus, § 152(b) only has application to common carriers, and our affirmance of the Commission's non-common carrier classification of SMRS vitiates any objection which might rest upon it.

## III. *Conclusion*

The 1974 Order, as modified by the 1975 Order, is upheld.

In affirming the allocation of 40 MHz for development of a cellular system, we are not unaware of substantial anticompetitive effects which may become more apparent as the date for general implementation of the systems draws nearer. In light of the Commission's broad discretion in experimentation and encour-

agement of the broader use of radio, we conclude that those effects are at present too speculative and distant in time to constitute this part of the Order a breach of discretion. We make no comment upon the possible success of any antitrust actions which may in the future be brought, nor upon possible challenges to Commission actions taken when anticompetitive effects, if any, have become more immediate and predictable.

In affirming the 30 MHz allocation and authorization of SMRS, to be treated in the same way as private operators, our holding is subject to future challenge should SMRS in practice behave as common carriers. This part of the Order, save the bare allocation of 30 MHz to the private services, which the Commission itself has stated to be severable,[94] will be open to renewed attack if it is later concluded that SMRS are in fact common carriers.

So ordered.

**94.** 51 F.C.C.2d at 976.