SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

EDS Corporation, Ameritech Operating Companies, Metropolitan Fiber Systems, Pacific Bell and Nevada Bell, WilTel, Inc., Bell Atlantic Telephone Companies, NYNEX, MCI Telecommunications Corporation, Intervenors.

SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

EDS Corporation, Metropolitan Fiber Systems, Pacific Bell and Nevada Bell, WilTel, Inc., Bell Atlantic Telephone Companies, NYNEX, MCI Telecommunications Corporation, Intervenors.

U S WEST COMMUNICATIONS, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Bell Atlantic Telephone Companies, NYNEX, Ameritech Operating Companies, Southwestern Bell Telephone Company, WilTel, Inc., Pacific Bell and Nevada Bell, MCI Telecommunications Corporation, Metropolitan Fiber Systems, Inc., Intervenors. (Two Cases)

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY and South Central Bell Telephone Company, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

NYNEX, Ameritech Operating Companies, Southwestern Bell Telephone Company, WilTel, Inc., MCI Telecommunications

Corporation, Pacific Bell and Nevada Bell, Metropolitan Fiber Systems, Inc., Bell Atlantic Operating Companies, Intervenors. (Two Cases)

The BELL ATLANTIC TELEPHONE COMPANIES, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

NYNEX, Ameritech Operating Companies, Southwestern Bell Telephone Company, WilTel, Inc., MCI Telecommunications Corporation, Pacific Bell and Nevada Bell, Metropolitan Fiber Systems, Inc., Intervenors. (Two Cases)

U S WEST COMMUNICATIONS, INC., BellSouth Telecommunications, Inc., Bell Atlantic Telephone Companies, Southwestern Bell Telephone Company, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

WilTel, Inc., EDS Corporation, International Business Machines Corporation, Intervenors.

Nos. 91–1416, 91–1417, 91–1440, 91–1446, 91–1447, 91–1453, 91–1454 and 93–1360.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1994.

Decided April 5, 1994.

Robert B. McKenna, Denver, CO, argued the cause, for petitioners. With him on the briefs were Robert M. Lynch, Richard C. Hartgrove, Robert J. Gryzmala, St. Louis, MO, M. Robert Sutherland, Atlanta, GA, and Lawrence W. Katz, Washington, DC. Leo J. Bub, San Antonio, TX, entered an appearance in No. 91–1416. William B. Barfield and R. Frost Branon, Jr., Atlanta, GA, entered appearances in Nos. 91–1446 and 91–1447. John Thorne, Michael D. Lowe, Washington, DC, J. Manning Lee, McLean, VA, Mark J. Mathis, Philadelphia, PA, James R. Young and Lawrence W. Katz, Washington, DC, entered appearances in Nos. 91–1453 and 91–1454. Durward D. Dupre, St. Louis, MO, entered an appearance in No. 93–1360.

Laurence N. Bourne, Counsel, F.C.C., Washington, DC, argued the cause, for respondents. With him on the brief was Renee Licht, Acting General Counsel, F.C.C., Daniel M. Armstrong, Associate General Counsel, F.C.C., John E. Ingle, Deputy Associate General Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., U.S. Dept. of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, U.S. Dept. of Justice, Washington, DC.

On the joint brief for intervenors Electronic Data Systems Corp., MCI Telecommunications Corp., and WilTel, Inc., were Randolph J. May, Richard S. Whitt, Frank W. Krogh, Donald J. Elardo, Eric Fishman and William L. Fishman, Washington, DC. Floyd S. Keene, Milwaukee, WI, Alfred Winchell Whittaker, Andrew D. Lipman, Washington, DC, James P. Tuthill, Margaret deB. Brown, John W. Bogy, Stanley J. Moore, San Francisco, CA, John Thorne, Michael D. Lowe, Washington, DC, J. Manning Lee, McLean, VA, Mark J. Mathis, Philadelphia, PA, Donald W. Boecke, William T. Lake, J. Roger Wollenberg, Washington, DC, entered appearances.

Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioners Southwestern Bell Telephone Company, US West Communications, Inc., BellSouth Telecommunications, Inc., and the Bell Atlantic Telephone Companies challenge a series of Federal Communications Commission ("FCC" or "Commission") orders which prescribed rates for so-called "dark fiber" communications services, directed petitioners to provide these services as a general offering, and, finally, denied permission to withdraw dark fiber service altogether. *In re Bell Atlantic Tel. Cos. Revisions to Tariff F.C.C. No. 1*, 6 F.C.C.R. 1436 (1991) ("Suspension Order"), 6 F.C.C.R. 4776 (1991) ("Suspension Review Order"), 6 F.C.C.R. 4891 (1991) ("Prescription Order"); *In re Southwestern Bell Tel. Co.*, 8 F.C.C.R. 2589 (1993) ("Section 214 Order") (refusing permission to withdraw offering). Petitioners claim that in issuing these orders the FCC exceeded its jurisdiction because they had offered dark fiber only on an individualized basis, thereby placing this service beyond the FCC's authority over common carrier offerings under title II of the Communications Act of 1934, as amended, 47 U.S.C. §§ 201–227 (1988 & Supp. III 1991). We find that the Commission has not sufficiently supported its conclusion that petitioners' dark fiber service was ever offered on a common carrier basis and accordingly remand to the Commission for reconsideration of its orders.

## I. Background

### A. Facts and Procedural History

In the 1970s scientists explored the possibility of transmitting information by sending light waves in the form of a concentrated laser beam through glass fibers. This method of communication proved far superior to the conventional forms of transmission of information via copper, coaxial cable, and microwave. Petitioners began to provide fiber optic telecommunications services on an individualized basis in 1985. Their initial "DS3" service combined high speed transmission equipment and associated fiber optic cable tailored to the specific needs of each customer. However, because of the specific characteristics of fiber optic technology, the electronic and other equipment necessary to power or "light" the glass fiber may be installed at either or both ends of the fiber. This feature permits petitioners to offer the fiber optic lines alone and allow subscribers to use customized equipment at their own end to send information along these routes. The provision of the fiber optic lines without the necessary electronic equipment to power the fiber is commonly known as "dark" fiber service, and is distinguishable from the original DS3 service for which petitioners light the fiber on behalf of their customers.

With the permission of the FCC, petitioners offered dark and lit fiber service, as well as certain other special services, on an individual case basis ("ICB") where each service contract was negotiated separately and specifically tailored to the particular needs of each customer. *See In re Investigation of Access and Divestiture Related Tariffs*, 97 F.C.C.2d 1082, 1143 (1984). These ICB contracts were then filed with the FCC.[1] In early 1988 the Bell Atlantic Telephone Companies and other Local Exchange Carriers ("LECs") proposed revisions to their ICB rates for DS3 (lit fiber) service which triggered an FCC investigation into whether these tariffs exhibited "unjust or unreasonable discrimination" in violation of section 202(a) of the Communications Act, 47 U.S.C. § 202(a). *See In re Local Exchange Carriers' Individual Case Basis DS3 Service Offerings*, 4 F.C.C.R. 8634 (1989) ("ICB Order").

At the conclusion of that investigation, the Commission explained that " 'ICB' pricing is usually used when a carrier adopts a practice of developing a price for a particular service or facility in response to each customer request for the service or facility." *ICB Order*, 4 F.C.C.R. at 8641 ¶ 63. While it was theoretically possible to construct nondiscriminatory ICB tariffs, the Commission "presume[d] that ICB pricing ... is discriminatory." *Id.* at 8642 ¶ 67. Therefore "once exchange carriers have sufficient experience with a service such as the provision of DS3 [lit fiber] facilities to permit the development of averaged rates, they must file such rates." *Id.* at 8642 ¶ 68. Accordingly, it ordered those companies with sufficient DS3 experience to file averaged tariffs for their lit fiber service,[2] but refrained from requiring the LECs to file averaged tariffs for dark fiber because of the carriers' apparent lack of experience in that area. *Id.* at 8645 ¶ 88.

---

**1.** We are unable to determine with any confidence exactly why these ICB contracts were filed with the FCC. At oral argument, petitioners declared that the ICBs (or at least a large portion thereof) were filed pursuant to their obligation under 47 U.S.C. § 211(a) to file "all contracts ... with other carriers." *See* Transcript of Oral Argument 28–29. However, counsel for the FCC maintained that while the Commission had never ordered the filing of ICBs, the modified final judgment in the AT & T divestiture case imposed a general line of business restriction on regional operating companies, such as petitioners, limiting these to tariffed monopoly services. *See United States v. American Tel. and Tel. Co.*, 552 F.Supp. 131, 228 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). While this restriction was lifted in 1987, *see United States v. Western Elec. Co.*, 673 F.Supp. 525, 597–604 (D.D.C.1987), *aff'd in part, rev'd in part*, 900 F.2d 283 (D.C.Cir.1990), the FCC noted during oral argument that because of the modified final judgment "there [was] arguably some compulsion" to file ICB tariffs with the FCC when they initially began offering dark fiber in 1984. *See* Transcript of Oral Argument 28. The Commission has never attempted to explain how this compulsion relates to its conclusion that filing ICBs inevitably constitutes an offer of common carriage.

**2.** Petitioners do not challenge the FCC's determination with respect to DS3 lit fiber here.

On reconsideration, the Commission decided on the basis of new information that several carriers indeed had "sufficient experience in the provision of dark fiber service to support the development of averaged rates." *In re Local Exchange Carriers' Individual Case Basis DS3 Service Offerings*, 5 F.C.C.R. 4842, 4845 ¶ 31 (1990) ("ICB Reconsideration Order"). While the record upon which the original ICB Order was based identified only 20 or so dark fiber ICBs, the Commission subsequently learned that Southwestern Bell had more than 120 dark fiber ICBs, Bell Atlantic had four ICBs consisting of 32 dark fibers in addition to 52 ICBs (any of which may involve more than one dark fiber installation), BellSouth had nine ICBs consisting of 34 fibers, and U S West had at least 12 ICBs consisting of 52 fibers. *ICB Reconsideration Order*, 5 F.C.C.R. at 4845 ¶ 32.

In deciding to exercise title II jurisdiction over petitioners' dark fiber service, the Commission declined to examine the specific circumstances surrounding these offerings. Instead, the FCC decided that by filing the ICBs the carriers had acceded to the common carriage status necessary to support the Commission's jurisdiction. *Id.* at 4847 n. 15. Accordingly, the FCC ordered these carriers to "offer dark fiber as a generally available service at averaged rates[,] ... to amend their dark fiber ICBs to terminate not later than one year from the release of this [Reconsideration] Order[, and] ... to file general rates for dark fiber service." *Id.* at 4845 ¶ 33.

Denied a waiver of the order, *In re Local Exchange Carriers' Individual Case Basis DS3 Service Offerings*, 5 F.C.C.R. 6772 (1990), petitioners filed averaged rates purportedly complying with the Reconsideration Order. The FCC, however, suspended the filed rates in part and prescribed new rates. *Suspension Order*, 6 F.C.C.R. 1436; *Suspension Review Order*, 6 F.C.C.R. 4776; *Prescription Order*, 6 F.C.C.R. 4891. Subsequently, the FCC denied petitioners permission to withdraw from the dark fiber market because petitioners had not borne their burden of showing that such a withdrawal would not adversely affect public convenience or

necessity. *Section 214 Order*, 8 F.C.C.R. 2589. Petitioners now challenge the Suspension, Prescription, and Section 214 Orders on the basis that the FCC lacked common carriage jurisdiction over the dark fiber service offerings, that the FCC exceeded its statutory authority in prescribing interim rates during the period of rate suspension, and that the FCC impermissibly relied on an *ex parte* communication in reaching its decision in the Section 214 Order. For reasons set forth below, we reach only the first contention and remand to the FCC for reconsideration of its authority to regulate dark fiber.

### B. *Statutory Framework*

The Communications Act of 1934 ("Act") established the Federal Communications Commission "for the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. The Act gives the Commission specific regulatory responsibilities regarding common carriers under title II of the Act, *id.* at §§ 201–227, and broadcasting under title III, *id.* at §§ 301–399b. In addition, the Commission has general regulatory jurisdiction over "all interstate and foreign communications by wire or radio ... and ... all persons engaged within the United States in such communication [except for communication in the Canal Zone]." *Id.* at § 152(a). The Commission's general jurisdiction over interstate communication and persons engaged in such communication, however, "is restricted to that reasonably ancillary to the effective performance of [its] various responsibilities" under titles II and III of the Act. *United States v. Southwestern Cable Co.*, 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968); *see also FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972).

The centerpiece of title II common carrier regulation is the supervision of filed tariffs.

Pursuant to title II, every common carrier must file tariffs with the FCC for the communication services it provides. 47 U.S.C. § 203(a). Any charge for a common carrier service that is "unjust," "unreasonable," or "unreasonabl[y] discriminat[ory]" is unlawful and shall be so declared by the Commission. *Id.* at §§ 201(b), 202(a). Whenever a common carrier files a new or revised tariff, the Commission may suspend the charge for a period of five months, conduct an investigation into the lawfulness of the charge, and prescribe rates after holding appropriate hearings. *Id.* at § 204. The Commission may also suspend any existing charge and issue a cease and desist order prescribing the proper charge to be collected, provided the FCC has conducted a full hearing and concluded the existing charge to be unlawful. *Id.* at § 205. Finally, section 214 provides that "[n]o carrier shall discontinue, reduce, or impair service … unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby." *Id.* at § 214(a).

All of the described regulation of tariffs under title II of the Act, however, hinges upon the premise that the regulated entity is a common carrier. Yet, the Communications Act itself does not define the specific characteristics of a common carrier and basically just repeats the term in its definition of a common carrier as "[a]ny person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio." *Id.* at § 153(h). Similarly, the Commission's regulatory interpretation of the Act simply provides that a communication common carrier is "any person engaged in rendering communication service for hire to the public." 47 C.F.R. § 21.2 (1992). As a result, noting that "the circularity and uncertainty of the common carrier definitions set forth in the statute and regulations invite recourse to the common law of carriers," reviewing courts have fashioned the following two-part test for common carriage:

> [T]he primary *sine qua non* of common carrier status is a quasi-public character, which arises out of the undertaking to carry for all people indifferently. This

does not mean that the particular services offered must practically be available to the entire public; a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he *holds himself out to serve indifferently all potential users….*

> A second prerequisite to common carrier status [is] … that the system be such that customers transmit intelligence of their own design and choosing.

*National Ass'n of Regulatory Util. Comm'rs v. FCC,* 533 F.2d 601, 608–09 (D.C.Cir.1976) ("*NARUC II* ") (internal quotes and footnotes omitted) (emphasis added). *See also National Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630 (D.C.Cir.) ("*NARUC I* "), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). We use that test today.

## II. DISCUSSION

The legality of the orders on review ultimately rests upon the validity of treating petitioners' dark fiber service as a common carrier offering subject to full regulation under title II of the Communications Act. Petitioners became entangled in the FCC's web of common carrier regulation solely by virtue of filing the ICB contracts. Without examining the actual contours of the dark fiber offerings represented by the ICBs, the Commission imposed upon petitioners its full regulatory power under title II. Without pointing to any specific legal or regulatory obligation that would require petitioners to provide dark fiber on a common carrier basis, the FCC categorically maintains that filing any tariff, including ICB contracts, with the Commission "necessarily constitute[s] a commitment to offer the service on a common carrier basis." Brief for Respondents at 28. According to the Commission, the ICB arrangements—whether for dark or lit fiber— were merely a pricing mechanism and did not affect the indiscriminate nature of the offering itself. Therefore, the Commission concludes, it had jurisdiction to order the filing of averaged tariffs, to suspend the filed tariffs and prescribe appropriate rates, and to deny permission to withdraw the dark fiber offering altogether. Without express-

ing any opinion on whether the Commission may have a *different* and adequate reason for regulating dark fiber, we are not satisfied with the logic underlying the orders as they stand now.

■ Whether an entity in a given case is to be considered a common carrier or a private carrier turns on the particular practice under surveillance. If the carrier chooses its clients on an individual basis and determines in each particular case "whether and on what terms to serve" and there is no specific regulatory compulsion to serve all indifferently, the entity is a private carrier for that particular service and the Commission is not at liberty to subject the entity to regulation as a common carrier. *NARUC II*, 533 F.2d at 608–09; *NARUC I*, 525 F.2d at 643. While the Commission may look to the public interest in fine-tuning its regulatory approach, it may not impose common carrier status upon any given entity on the basis of the desired policy goal the Commission seeks to advance. *NARUC I*, 525 F.2d at 644. Since the parties evidently agree that dark fiber customers transmit intelligence of their own design, we need only address the application of the first part of the *NARUC II* test.

### A. Private Contract–Based Services Offered by Common Carriers

■ The mere fact that petitioners are common carriers with respect to some forms of telecommunication does not relieve the Commission from supporting its conclusion that petitioners provide dark fiber on a common carrier basis. As we said in *NARUC II*, "it is at least logical to conclude that one can be a common carrier with regard to some activities but not others." 533 F.2d at 608. Undoubtedly, private interstate communications services rendered by a common carrier remain within the purview of the FCC, if only pursuant to the Commission's general title I jurisdiction which authorizes FCC regulation that is "reasonably ancillary" to the exercise of specifically delegated powers under the Act. *Southwestern Cable Co.*, 392 U.S. at 178, 88 S.Ct. at 2005; *NARUC II*, 533 F.2d at 612. However, the specific regulation of rates under title II of the Act and the requirement to obtain permission prior to

withdrawal of service pursuant to section 214 do not, without more, apply to the private service offered by a sometime common carrier.

Petitioners offered certain telecommunications services on a common carrier basis, *e.g.*, ordinary telephone service. Their entry into the dark fiber market, however, began as a limited, customer-specific service. The FCC originally had permitted petitioners to provide special services, including dark fiber, on an ICB basis without filing conventional tariffs until the carriers "develop rates or generally applicable regulations for these facilities." *Investigation of Access and Divestiture Related Tariffs*, 97 F.C.C.2d at 1143. These ICB service contracts were individually tailored arrangements negotiated to last for periods of five to ten years. As an initial matter, therefore, they were not like the indiscriminate offering of service on generally applicable terms that is the traditional mark of common carrier service. *See NARUC I*, 525 F.2d at 643.

■ To be sure, a carrier cannot vitiate its common carrier status merely by entering into private contractual relationships with its customers. *Akron, C. & Y. R.R. v. Interstate Commerce Comm'n*, 611 F.2d 1162, 1167 (6th Cir.1979), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 34 (1980); *see also MCI Telecommunications Corp. v. FCC*, 917 F.2d 30, 38 (D.C.Cir.1990). But at the same time, it does not make sense that the filing of the terms of any contract—no matter how customer tailored—with the FCC, without more, reflects a conscious decision to offer the service to all takers on a common carrier basis. There is no inherent inconsistency in recognizing that *some* filings of contracts may be just that: the filing of private contracts for private carriage. Indeed, to decide otherwise would be inconsistent with FCC precedent and the structure of the Communications Act.

### B. Filing Obligations Under Commission Precedent and the Communications Act

■ In 1984 the FCC commenced a rulemaking seeking "to modify [the Commission's] traditional common-carrier treatment of special construction of lines and special

service arrangements." *In re Special Construction of Lines and Special Service Arrangements Provided by Common Carriers,* 97 F.C.C.2d 978, 981 (1984) ("Special Construction NPRM") (notice of proposed rulemaking) (footnotes omitted). Six years later, in 1990, the rulemaking was abandoned in a terse, four-paragraph order, stating only that the record originally compiled in support of the rulemaking had become stale. *In re Special Construction of Lines and Special Service Arrangements Provided by Common Carriers,* 5 F.C.C.R. 5410 (1990). Technically, therefore, the FCC has not disavowed its "traditional common-carrier treatment" of special service arrangements. Nonetheless, the Commission's Special Construction NPRM in 1984 reasoned "that there is no 'legal compulsion' for a carrier to provide special activities to the public indifferently under the Communications Act or [the FCC's] regulatory policies." 97 F.C.C.2d at 982. Without, of course, relying on the superseded Special Construction NPRM as support for today's holding, we pause to note the contradiction between the reasoning espoused in 1984 and that contained in the rulemaking currently before us.

In this review, the FCC maintains that the filing of an ICB "is in no way related to, and in no way affects, the general availability of a service offering" and simply provides "a transitional method of pricing a tariffed service." *Section 214 Order,* 8 F.C.C.R. at 2594 ¶ 22. However, it flatly contradicted this view in 1984 saying that "[t]ypically, these [special construction] lines are individually tailored, constructed, *and* priced, ... in response to a customer's request where ordinary tariffed *(generally offered)* services would not satisfy that request." *Special Construction NPRM,* 97 F.C.C.2d at 978–79, 981 (emphasis added). Thus "[s]pecial service arrangements are different from, and do not include, services made generally available by the carrier." *Id.* at 991. Further supporting the private nature of ICB offerings, the Special Construction NPRM admitted:

In at least one way, our rules already treat these special activities differently than common carrier offerings. We require the carrier to transmit to the customer a copy of the explanation and data supporting the rate for special construction, special assembly equipment, and special service arrangements. This carrier-to-individual customer transfer of cost information is consistent with viewing these offerings as private dealings rather than general, indiscriminate offerings.

*Id.* at 989–90 (footnotes omitted). Back then, the Commission also recognized that even when special construction tariffs are filed with the FCC they do not automatically evolve into common carrier offerings. Instead, "special construction ... tariffs merely note a private contractual agreement between a carrier and an individual customer." *Id.* at 989 (footnote omitted).

In a recent rulemaking which adopted a new system of price cap regulation for the nation's largest local exchange carriers and which *does* constitute Commission precedent, the Commission unequivocally proclaimed that not all ICB offerings are indiscriminate offers of common carriage service. In the course of explaining why it declined to extend price cap regulation to all ICB offerings, the Commission discussed the relationship between ICBs and common carrier offerings:

ICB offerings are those offered on a contract-type basis. While ICB offerings appear in LEC tariffs, they are not tariffed as generally-available, common carrier services. In some cases, ICB services feature new technology for which little demand exists. As demand for the service grows, the ICB offering can evolve into a generally-available offering, as has been the case with large, digital, fiber optic transmission facilities.[3] *In other applications, ICB offerings are simply unique service arrangements to meet the needs of specific custom-*

---

**3.** The Price Cap Order cites the fiber optic rulemaking on review as its sole support for the factual conclusion that the fiber optic transmission facilities have evolved into common carrier offerings. It would be circular to rely on the Price Cap Order for any conclusion that dark fiber was offered on a common carrier basis. The importance of the quoted passage lies in the general recognition that an ICB *can*—but need not—evolve into a common carriage service.

ers that will never evolve into generally-available offerings.

*In re Policy and Rules Concerning Rates for Dominant Carriers,* 5 F.C.C.R. 6786, 6810 ¶ 193 (1990) ("Price Cap Order") (footnotes omitted) (emphasis added). Moreover, we have upheld the FCC where it *detariffed* service elements that had been previously offered on a tariffed basis and initially treated as common carrier offerings, because upon further inspection they were determined not to be common carriage communications offerings within the meaning of the Act. *See Computer and Communications Indus. Ass'n v. FCC,* 693 F.2d 198 (D.C.Cir. 1982), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983) (removing customer premises equipment from tariff). This would be difficult to explain if the mere filing of the terms of service with the FCC presented conclusive proof of common carriage regardless of the substance of the conditions on which the service is furnished. If the filing of service arrangements with the FCC were a sufficient indicator of common carriage, the Commission presumably could never conclude that a service once provided at a filed rate turned out not be a common carriage service upon further inspection.

To hold, as the FCC now urges, that any ICB filing with the Commission constitutes a holding out to all persons indifferently also would render problematic the Commission's statutory power under section 211 of the Communications Act. Section 211(b) permits the Commission "to require the filing of any ... contract[ ] of any carrier." 47 U.S.C. § 211(b). It gives the Commission the power to require the filing of contracts for *private* service offerings in order to protect the integrity of *common* carrier regulation under the Act. As the Commission noted in 1984:

> Even if there is no 'legal compulsion' to provide special activities to the public indifferently, we tentatively conclude that they would fall within our ancillary jurisdiction. That is, we believe that we would have a continuing interest in obtaining information about these special services.... Offerings that are purportedly special activities but which are in fact offered to the public indifferently may provide a carrier

with a means to discriminate among its customers. The policies of [t]itle II would require the Commission to scrutinize a carrier's use of offerings by private contract to promote just, reasonable, and nondiscriminatory charges for common carrier services.

*Special Construction NPRM,* 97 F.C.C.2d at 988 (citing 47 U.S.C. § 211) (footnotes omitted). We agree. To ensure that a common carrier's private service offerings do not undermine the regulation of its common carriage offerings, the FCC can require the carrier to file even those contracts that provide for customized private carriage. Indeed, in order to prevent carriers from circumventing title II regulation by crafting special service arrangements with other carriers, the Act itself mandates that a carrier file certain contracts—regardless of whether they constitute individualized or even unique service arrangements—whenever the customer is itself a carrier:

> Every carrier subject to this chapter shall file with the Commission copies of all contracts, agreements, or arrangements with other carriers, or with common carriers not subject to the provisions of this chapter, in relation to any traffic affected by the provisions of this chapter to which it may be a party.

47 U.S.C. § 211(a). If the Commission were permitted simply to deduce from the filing of any service contract that the service had been offered on a common carrier basis, section 211 would supply the bootstrap for title II common carriage rate regulation of virtually any service provided by an entity whenever that entity furnishes a portion of its services on a common carrier basis. The Communications Act could not have intended so to provide. While the Commission has ancillary jurisdiction over private offerings of common carriers under section 152 and may require common carriers to supply information regarding their private carriage offerings pursuant to section 211, only common carrier activity falls within the Commission's regulatory powers under title II. *MCI Telecommunications Corp. v. FCC,* 765 F.2d 1186, 1188 (D.C.Cir.1985); *Computer and*

*Communications Indus. Ass'n,* 693 F.2d at 211. .

### III. CONCLUSION

The Communications Act delegates broad authority to the Commission to regulate constantly evolving communications facilities that have transcended in complexity and power far beyond the specific technologies known to its drafters in 1934. The emergence of these new technologies cannot be permitted to undermine the Commission's comprehensive, unified jurisdiction over interstate communications. *Southwestern Cable,* 392 U.S. at 172–73, 88 S.Ct. at 2002. Nonetheless, the Commission's expansive power under the Act does not include the "untrammelled freedom to regulate activities over which the statute fails to confer, or explicitly denies, Commission authority." *NARUC II,* 533 F.2d at 617. In order to regulate an activity under title II of the Communications Act, the Commission must first determine whether the service is being offered on a common carrier basis. In this instance, the Commission short-circuited any analysis of whether petitioners held themselves out indifferently to all potential users of dark fiber, by pronouncing an insupportable *per se* rule that a filing of a piece of paper with the FCC constitutes an offer of common carriage. We certainly do not impugn the intentions of the FCC to serve the public interest by regulating dark fiber, and we do not decide today whether the Commission may draw on other authority, such as its ancillary jurisdiction, to regulate petitioners' services. But we cannot permit the Commission to augment its regulatory domain, as it has attempted to do here, by redefining the elements of common carriage to include any service arrangement that is recorded with the FCC. Because we find that the Commission provided insufficient support for concluding that petitioners had offered dark fiber service on a common carrier basis we remand the three orders to the Commission for reconsideration of the basis for its authority to regulate dark fiber service without reaching petitioners' other contentions. The orders on review are suspended pending completion of proceedings on remand.

*Remanded.*