Destek v. Verizon, et al.          CV-99-494-B    7/31/01
                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE


The Destek Group, Inc.,
d/b/a The Destek Networking
Group

        v.                              Civil No. 99-494-B
                                        Opinion No. 2001 DNH 140
Verizon New England, Inc.,
d/b/a Verizon New Hampshire,
et al.



                   <u>MEMORANDUM AND ORDER</u>


     The Destek Group, Inc. seeks judicial review, pursuant to

the Telecommunications Act of 1996, of a decision of the New

Hampshire Public Utilities Commission approving a contract in

which Verizon New England, Inc. agreed to provide asychronous

transfer mode cell relay service to the University of New

Hampshire.  <u>See</u> 47 U.S.C. § 252(e)(6).  Destek also seeks damages

and injunctive relief against Verizon, the Commission, and the

three individual Commissioners pursuant to 42 U.S.C. § 1983.  I

have before me the parties' cross-motions for summary judgment.

## I.   BACKGROUND

On March 16, 1999, Verizon[1] entered into a contract (the "ATM Contract") to provide asychronous transfer mode ("ATM")[2] cell relay service to the University for sixty months at a rate of $655.75 per interface per month, provided that the University purchase at least 30 interfaces.  The ATM Contract states that these terms shall not apply until Verizon receives all "necessary regulatory and other governmental approvals."

On June 4, 1999, Verizon submitted the ATM Contract to the New Hampshire Public Utilities Commission (the "Utilities Commission" or the "Commission") for approval, in accordance with N.H. Rev. Stat. Ann. § 378:18.[3]  Section 378:18 provides as

---

[1]  Prior to August 1, 2000, Verizon was known as New England Telephone and Telegraph Company and did business as Bell Atlantic-New Hampshire.  For ease of reference, I refer to it as Verizon throughout this Memorandum and Order.

[2]  ATM is a "high-speed cell-switching network technology for [local and wide-area networks] that handles data and realtime voice and video.  It combines the high efficiency of packet switching used in data networks, with the guaranteed bandwidth of circuit switching used in voice networks."  Alan Freedman, The Computer Glossary 20 (8th ed. 1998).

[3]  Verizon also filed a motion for a protective order, seeking confidential treatment for certain cost data pertaining to the ATM Contract.  The Utilities Commission granted Verizon's motion on October 4, 1999.

follows:

> Nothing herein shall prevent a public utility from making a contract for service at rates other than those fixed by its schedules of general application, if special circumstances exist which render such departure from the general schedules just and consistent with the public interest and, except as provided in RSA 378:18-b, the [C]ommission shall by order allow such contract to take effect.

Section 378:18-b, in turn, provides that:

> Any special contracts for telephone utilities providing telephone services shall be filed with the [C]ommission and shall become effective 30 days after filing, provided the rates are set not less than: (I) The incremental cost of the relevant service; or (II) Where the telephone utility's competitors must purchase access from the telephone utility to offer a competing service, the price of the lowest cost form of access that competitors could purchase to compete for customers with comparable volumes of usage, plus the incremental cost of related overhead.

In its transmittal letter to the Utilities Commission, Verizon stated that the ATM Contract:

> is clearly in the public interest. This contract will provide the opportunity for all K-12 schools, the University System of New Hampshire and libraries throughout the state to obtain access to multi-site distance learning facilities as well as high speed internet access. This network will provide the opportunity for students to access advanced placement courses

and other educational resources that are not offered at facilities in their region. This network will also provide increased professional development opportunities for teachers and administrators.

In addition, Verizon claimed that failure to approve the ATM Contract "will likely result in higher prices to affected customers, fewer service alternatives and lost contribution to the joint and common costs borne by the general body of ratepayers."

On June 25, 1999, Destek, a commercial provider of telecommunications services, sent a letter to the Utilities Commission objecting to the ATM Contract and requesting that the Commission conduct hearings on the matter and allow Destek to intervene in the proceeding. Destek argued that the ATM Contract should not be approved because special contracts authorized by N.H. Rev. Stat. Ann. § 378:18, such as the ATM Contract, "are discriminatory and minimize or eliminate the ability for other companies, like Destek, to compete."

On June 30, 1999, Tom Lyle and Paul Keller, members of the Utilities Commission's Economics Department, sent a memorandum to the Commissioners, and to the heads of the Commission's other departments, recommending that the Commission deny, without

-4-

prejudice, Verizon's request for approval of the ATM Contract. In their memorandum, Lyle and Keller stated that the "cost support data filed with the petition is devoid of any verifiable documentation in support of its reported cost to provide ATM services and the cost support data does not provide ANY detail about the method [Verizon] used to allocate non-direct, joint and common costs" to the University. Because of this lack of information, Lyle and Keller were "not certain whether or not the benefits of the special contract to [the University] outweigh the costs to non-special contract customers."

A few days later, on July 2, 1999, Kate Bailey of the Utilities Commission's Engineering Department sent a memorandum to the Commissioners recommending that they approve the ATM Contract. Bailey began her memorandum by noting that the ATM Contract "provides schools the opportunity to have T1 access to the Internet and video conferencing between schools on the network for a flat price (which is easier to budget than a price with usage or distance sensitive charges)." Because of this potential public benefit, Bailey "performed an independent cost analysis" to determine whether the ATM Contract satisfied the requirements of N.H. Rev. Stat. Ann. § 378:18-b.

Bailey based her analysis on "assumptions about where the initial 30 customers would be located." Ultimately, she concluded that the ATM Contract's price of $655 per connection was not discriminatory, and therefore not in violation of N.H. Rev. Stat. Ann. § 378:18-b, because it exceeded the actual expected cost per connection, which would be either $613.35 or $627.86, depending upon the equipment used.

Based on this analysis, Bailey concluded that "Destek's objection has no merit [because it] could put a similar network together . . . for a cost similar to that calculated." Moreover, she noted that Verizon had publicly offered to make ATM services available at the same price to anyone who would purchase at least thirty interfaces.

On July 7, 1999, the Utilities Commission issued an Order approving the ATM Contract on the condition that Verizon: (1) file a tariff "making ATM services available throughout [New Hampshire] upon the same terms and conditions and at the same prices as in" the ATM Contract; and (2) resubmit the ATM Contract to the Commission "disclosing the number of ATM circuits and the average number of miles to serve customer locations from a serving wire center."

In its Order, the Commission noted that Verizon had not provided many details regarding the actual cost to it of providing ATM services to the University, thereby making it difficult for the Commission to determine whether the ATM Contract satisfied the requirements of N.H. Rev. Stat. Ann. § 378:18-b. The Commission went on to say, however, that "because of the importance of the proposed service to the modernization of the state's educational system, [the Commission's] Staff drew on information in the filing and in related dockets to develop estimates of the appropriate cost floors for RSA 378:18-b analysis. This estimate shows the proposed rate exceeds, by a narrow margin, the cost of providing ATM service."

The Commission noted that "[u]nder ordinary circumstances," it would not rely on its staff's "uncertain estimates," but would instead "suspend the filing and open an investigation" in order to determine whether the contract at issue satisfied the statutory requirements. In this case, however, the Commission stated that "special circumstances" existed which made an investigation unnecessary. Specifically, the Commission observed that the delay accompanying an investigation "could unnecessarily deny school children the benefits of ATM services during the

upcoming school year." Moreover, because: (1) Verizon was willing to offer ATM services to other customers on the same terms as provided in the ATM Contract; and (2) the Engineering Department's estimates showed that the proposed terms satisfied the requirements of N.H. Rev. Stat. Ann. § 378:18-b, the Commission found that allowing the University to take advantage of the terms of the ATM Contract was not "unduly discriminatory and meets the requirements of the statutes."

Destek, the New Hampshire Office of the Consumer Advocate, and Vitts Networks, Inc. each filed a motion asking the Utilities Commission to reconsider its Order. Destek argued, among other things, that the Commission's approval of the ATM Contract violated: (1) §§ 251(b) and 253(a) of the Telecommunications Act of 1996, 47 U.S.C. §§ 251(b) and 253(a); and (2) the Fourteenth Amendment's Due Process Clause. The Utilities Commission held two hearings on these motions, and issued an Order on November 22, 1999 denying them in their entirety.

Destek initiated this litigation on October 18, 1999 and filed an amended complaint on April 28, 2000. It asserts three claims. In Count I, Destek seeks judicial review of the Utilities Commission's decision approving the ATM Contract based

on § 252 of the Telecommunications Act, 47 U.S.C. § 252. Destek claims that the ATM Contract is in violation of the Act because its terms are discriminatory and contrary to the public interest. In Counts II and III, Destek brings claims against Verizon, the Utilities Commission, and the members of the Commission, Douglas L. Patch, Nancy Brockway, and Susan S. Geiger, pursuant to 42 U.S.C. § 1983. It alleges in these counts that the defendants: (1) violated Destek's rights under the Telecommunications Act when it approved the ATM Contract; and (2) violated Destek's right to due process when it conditionally approved the ATM Contract without granting Destek's request for a hearing. Destek seeks monetary damages, injunctive relief, declaratory relief, and attorneys' fees. The parties have filed cross-motions for summary judgment.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, shows that no material facts remain in genuine dispute and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d

86, 94-95 (1st Cir. 1996). A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena, 95 F.3d at 94 (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249).

"Cross motions for summary judgment neither alter [this standard of review], nor warrant the grant of summary judgment per se." Wightman v. Springfield Terminal Railway Co., 100 F.3d

-10-

228, 230 (1st Cir. 1996). "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Id.</u>

I apply this standard in reviewing the parties' cross-motions for summary judgment.[4]

## III. <u>DISCUSSION</u>

[4] Verizon has claimed throughout this litigation that the case should be decided exclusively on the administrative record produced by the Utilities Commission. Accordingly, on December 7, 2000, it filed both a motion to stay discovery, (Doc. No. 34), and a motion for summary judgment, (Doc. No. 35). Destek filed its opposition to the motion to stay on December 26, 2000. (Doc. No. 41). On December 28, 2000, I granted Verizon's request for a stay but informed Destek that it "may oppose summary judgment by contending that it is entitled to conduct discovery before the motion for summary judgment can be decided." Margin Order, (Doc. No. 36).
Although Destek continues to complain that it has not yet been accorded discovery, it filed its own summary judgment motion and elected to address the merits of Verizon's summary judgment motion rather than basing its objection on Fed. R. Civ. P. 56(f). The First Circuit has recognized that "a party ordinarily may not attempt to meet a summary judgment challenge head-on but fall back on Rule 56(f) if its first effort is unsuccessful." <u>C.B. Trucking, Inc. v. Waste Mgmt., Inc.</u>, 137 F.3d 41, 44 (1st Cir. 1998). Moreover, Destek makes only a generalized claim that the case would benefit from additional discovery. This is not sufficient to support a request for relief under Rule 56(f). <u>See id.</u> at 44-45. Accordingly, I address the merits of the cross-motions for summary judgment rather than deferring a ruling until Destek has had an opportunity for discovery.

-11-

To better understand Destek's claims, I begin by discussing the relevant sections of the Telecommunications Act.

## A.   The Telecommunications Act

The purpose of the Telecommunications Act is to increase competition in the market for local telephone services. See Puerto Rico Tel. Co. v. Telecomms. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 7 (1st Cir. 1999); see also AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371-73 (1999). To achieve this goal, the statute imposes certain obligations on those companies that control the existing telecommunications network in a local area. Puerto Rico Tel. Co., 189 F.3d at 8; see 47 U.S.C. §§ 251, 252 (2001). Those companies, such as Verizon, are known as "incumbent local exchange carriers" ("ILECs"). See 47 U.S.C. §§ 252(j), 251(h) (defining "ILECs"); Verizon's Answer to Pl.'s Amended Cplt., (Doc. No. 19), ¶ 9 (admitting that Verizon is an ILEC); see also 47 U.S.C. § 153(26) (defining "local exchange carrier").

Under § 251 of the Telecommunications Act, if a telecommunications carrier[5] seeks to enter a local market and

---

[5] "The term 'telecommunications carrier' means any provider of telecommunications services, except that such term does not

-12-

compete with an ILEC, it may request permission from the ILEC to interconnect with its facilities and equipment. See 47 U.S.C. § 251; 47 C.F.R. § 51.5 (2000) ("Interconnection is the linking of two networks for the mutual exchange of traffic."). When a telecommunications carrier makes such a request, the ILEC must negotiate with it in good faith. 47 U.S.C. §§ 251(c)(1), 252(a)(1).

If the requesting telecommunications carrier and the ILEC agree on the terms under which the requestor will interconnect with the ILEC, the parties must submit their interconnection agreement to the relevant state regulatory commission for review.[6] 47 U.S.C. § 252(e)(1); see also id. § 153(41). The

_____

include aggregators of telecommunications services (as defined in [47 U.S.C. § 226])." 47 U.S.C. § 153 (44); see id. § 226(a)(2) (defining an aggregator to mean "any person that, in the ordinary course of its operations, makes telephones available to the public or to transient users of its premises, for interstate telephone calls using a provider of operator services."). The statute defines "telecommunications service" to mean "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." Id. § 153(46).

[6] Although I describe only those obligations and procedures that are applicable to voluntarily negotiated agreements, I note that the Act imposes different obligations and procedures on parties who reach an interconnection agreement through

-13-

state regulatory commission must either approve or reject the interconnection agreement.  Id. § 252(e)(1).  If the state regulatory commission fails to act on the agreement within ninety days after submission by the parties, the Act provides that the agreement "shall be deemed approved."  Id. § 252(e)(4).  Section 252(e)(2) provides that a state regulatory commission may only reject a voluntarily negotiated interconnection agreement if it finds that: (1) "the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement;" or (2) "the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity."  47 U.S.C. § 252(e)(2).

Section 252(e)(6) provides that in any case where a state regulatory commission "makes a determination under this section [§ 252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of

_____

arbitration.  See 47 U.S.C. §§ 252(b)-(e).  Significantly, a voluntarily negotiated agreement is not subject to the pricing standards set forth in 47 U.S.C. § 252(d) or the other obligations set forth in 47 U.S.C. § 251(b)-(c).  See id. § 252(a)(1).

section 251 of this title and this section [§ 252]." 47 U.S.C. § 252(e)(6). The only "determination" under § 252 that a state regulatory commission can make with regard to a voluntarily negotiated interconnection agreement is a decision, under § 252(e)(1), to approve or reject the agreement based on the criteria set forth in § 252(e)(2). See 47 U.S.C. § 252; see also Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc., 240 F.3d 279, 303 (4th Cir.), cert. granted in part sub nom., Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland, 121 S.Ct. 2548 (2001) ("The only 'determination' that can be made by the State commission under § 252 on a negotiated agreement is a determination to approve or reject it." (emphasis in original)).

With this background in mind, I first turn to defendants' summary judgment motions.

## B. Defendants' Summary Judgment Motions

### 1. Count I: Destek's Claim for Judicial Review under 47 U.S.C. § 252(e)(6)

Destek claims in Count I of its amended complaint that it is entitled to federal court review of the ATM Contract pursuant to § 252(e)(6) of the Telecommunications Act because the contract is an interconnection agreement subject to the requirements of the

-15-

Act.   Section 252(e)(6) provides that an aggrieved party may seek judicial review in "any case in which a State commission makes a determination under this section."   47 U.S.C. § 252(e)(6) (emphasis added).   Thus, I must ascertain whether the Utilities Commission made a determination under § 252 of the Telecommunications Act when it approved the ATM Contract before I can assert jurisdiction to review the Commission's decision pursuant to § 252(e)(6).   See Puerto Rico Tel. Co., 189 F.3d at 13-14.

When Verizon submitted the ATM Contract to the Utilities Commission for review, it's expressed purpose was to comply with the requirements of N.H. Rev. Stat. Ann. § 378:18-b rather than the Telecommunications Act.   See Letter from Verizon to Utilities Commission of 6/4/1999 (the "Verizon Transmittal Letter"), App.[7], Tab 25.   Verizon's initial submission contained no reference to the Telecommunications Act, presumably because it believed that the ATM Contract was not an interconnection agreement, and, therefore, was not subject to the Act.   See id.   Similarly, Destek's initial objection and request to intervene did not refer to the Telecommunications Act.   See Letter from Susnock to

_____

[7]   "App." refers to the appendix to Verizon's motion for summary judgment, (Doc. No. 35).

Utilities Commission of 06/25/1999, App., Tab 13. It is not surprising, therefore, that the Utilities Commission's Order conditionally approving the ATM Contract did not discuss the Telecommunications Act, and instead focused on whether the ATM Contract complied with N.H. Rev. Stat. Ann. § 378:18-b. See Order No. 23,255 of the Utilities Commission, dated July 7, 1999, App., Tab 27.

In its motion for reconsideration, Destek argued that all special contracts contemplated by N.H. Rev. Stat. Ann. § 378:18, including the ATM Contract, violate §§ 251(b) and 253(a) of the Telecommunications Act because they give ILEC's an unfair competitive advantage in the local market for telecommunications services. See Destek's Mem. of Law in Support of Motion for Reconsideration, App., Tab 17 at 5-9. Destek did not argue, however, that the ATM Contract is an interconnection agreement that the Utilities Commission must either approve or reject in accordance with the standards set forth in § 252(e)(2) of the Act. See id. Because Destek did not assert a claim based on § 252, the Commission neither cited nor discussed § 252 in its subsequent Order. Instead, it denied Destek's motion, holding that neither § 251(b) nor § 253(a) prohibited the Commission from

-17-

approving special contracts in accordance with N.H. Rev. Stat. Ann. § 378:18. See Order No. 23,348 of the Utilities Commission (the "Order Denying Reconsideration"), dated Nov. 22, 1999, App., Tab 28 at 22-23.

The record in this case demonstrates that the Commission neither approved nor rejected the ATM Contract pursuant to § 252 and did not even decide whether the agreement was regulated by § 252. Accordingly, it did not make any "determination" under § 252 for me to review. See 47 U.S.C. § 252(e)(6). Therefore, I grant defendants' motions for summary judgment with regard to this claim.

2. **Counts II and III: Destek's § 1983 claims**

Destek also asserts claims for damages and injunctive relief based on 42 U.S.C. § 1983. In Count II of its amended complaint, Destek alleges that all of the defendants violated Destek's rights under the Telecommunications Act while acting under color of state law.[8] In Count III, Destek alleges that the Utilities

_____

[8] Because the parties have not briefed the issue, I will assume without deciding that § 1983 can be used to remedy violations of the Telecommunications Act in appropriate cases. See AT&T Wireless PCS, Inc. v. City of Atlanta, 210 F.3d 1322, 1327, 1327 n.7 (11th Cir. 2000) (subsequent procedural history omitted) (concluding that the Telecommunications Act can be

Commission and the three individual Commissioners violated Destek's right to due process under the Fourteenth Amendment. I first address Desktek's § 1983 claims against Verizon.

### a. Destek's § 1983 claims against Verizon

Destek's § 1983 claims against Verizon are plainly without merit. As the First Circuit has recognized "[s]ection 1983 . . . does not provide relief against most private individuals . . . the alleged deprivation must be 'fairly attributable to the state.'" Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 49 (1st Cir. 2000) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982)). Because Destek has not demonstrated that Verizon engaged in any conduct that is fairly attributable to the state, Verizon is entitled to summary judgment with respect to Destek's § 1983 claims.

### b. Destek's claims for damages against the Commission and the Commissioners in their official capacities

The Commission moves for summary judgment on the grounds that it is immune from suit under Section 1983 because it is a

---

enforced by using § 1983 but recognizing that district courts are split on the issue).

state agency.  Similarly, the Commissioners assert that they are entitled to summary judgment with regard to the claims against them for damages in their official capacities.  As discussed below, I agree.

Section 1983 provides for a cause of action against every "person" who, while acting under color of law, deprives another person of her federal rights.  42 U.S.C. § 1983.  The Supreme Court has held "that a State is not a person within the meaning of § 1983."  Will v. Mich. Dept. of State Police, 491 U.S. 58, 64 (1989).  Accordingly, a state agency, such as the Utilities Commission, may not be sued under Section 1983.[9]  Id. at 64-71; Wang v. N.H. Bd. of Registration in Medicine, 55 F.3d 698, 700 (1st Cir. 1995).  Therefore, I grant the Utilities Commission's motion for summary judgment.

---

[9]  Destek argues that the Utilities Commission waived its Eleventh Amendment immunity by agreeing to participate in the regulatory framework established by the Telecommunications Act. This argument is beside the point, however, because Destek chose to sue under § 1983, not under the Telecommunications Act. Even if the Commission has waived its Eleventh Amendment immunity, the fact remains that it is not a person for purposes of a § 1983 claim. See, e.g., McLaughlin v. Bd. of Trustees of State Colleges of Colorado, 215 F.3d 1168, 1172 (10th Cir. 2000) (holding that a § 1983 claim against a state agency was barred, even though the state had waived its Eleventh Amendment immunity, because a state is not a person for purposes of § 1983).

Destek's claims for damages against the Commissioners in their official capacities also are without merit. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will, 491 U.S. at 71 (internal citations omitted). Accordingly, a state official acting in her official capacity is not a "person" for purposes of Section 1983 and, therefore, may not be sued for damages under that statute. Id.; Wang, 55 F.3d at 700; see also Hafer v. Melo, 502 U.S. 21, 27 (1991) (discussing the distinction between official-capacity and personal-capacity suits). Therefore, I grant the Commissioners' motion for summary judgment with regard to the claims for damages against them in their official capacities.

c. **Destek's claims for damages against the Commissioners in their individual capacities**

The Commissioners argue that Destek's claims for damages against them in their individual capacities are barred by the doctrine of "quasi-judicial" immunity. I agree.

State officials, who "irrespective of their title, perform functions essentially similar to those of judges or prosecutors, in a setting similar to that of a court" are absolutely immune from suit based on those "quasi-judicial" functions. Bettencourt v. Bd. of Registration in Medicine, 904 F.2d 772, 782 (1st Cir. 1990); see Scott v. Central Maine Power Co., 709 F. Supp. 1176, 1181-85 (D. Me. 1989). In order to determine whether the Commissioners "perform functions similar to those of judges," and are therefore entitled to absolute immunity, I must answer three questions. Bettencourt, 904 F.2d at 783. First, does a Commissioner "perform a traditional 'adjudicatory' function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)?" Id. Second, does a Commissioner, like a judge, "decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions?" Id. Third, does a Commissioner "adjudicate disputes against a backdrop of multiple safeguards designed to protect a [participant's] constitutional rights?" Id. Because I answer these questions in the affirmative, I grant the Commissioners' motion for summary judgment with regard to Destek's claims for

damages against them in their individual capacities.

First, the Commissioners perform traditional adjudicatory functions when acting in their official capacities.  See Bettencourt, 904 F.2d at 783.  Whether they are reviewing contracts for compliance with the requirements of N.H. Rev. Stat. Ann. § 378:18-b, or reviewing interconnection agreements for compliance with the appropriate provisions of the Telecommunications Act, the Commissioners review the factual record before them, decide facts, apply the relevant law, and resolve disputes based upon the appropriate statutory factors. See id.

Second, the cases that come before the Commission are "sufficiently controversial."  The decision to approve or reject a special contract or an interconnection agreement "is likely to stimulate a litigious reaction from the disappointed [party], making the need for absolute immunity apparent."  Id.

Lastly, "enough safeguards exist to 'enhance the reliability of information and the impartiality of the [Commission's] decisionmaking process'" with regard to both special contracts and interconnection agreements.  Id. (quoting Butz v.

Economou, 438 U.S. 478, 512 (1978)).  The Commissioners make decisions in accordance with a process established by New Hampshire statutory law and regulations.  See, e.g., N.H. Rev. Stat. Ann. §§ 363:1-35 (setting forth the Commission's purpose, procedures, and ethical rules, e.g., prohibitions on ex parte contacts and conflicts of interest); N.H. Code Admin. R. PUC 201.01-205.10 (describing the Commission's procedures with regard to:  (1) the submission of pleadings and evidence; (2) discovery; and (3) hearings).  Among the protections afforded by that process include the right of a party to be represented by legal counsel.  N.H. Code Admin. R. PUC 201.03.  Moreover, the Commission must issue a written order explaining its decision.  N.H. Rev. Stat. Ann. § 363:17-b.

For the foregoing reasons, I conclude that the Commissioners are entitled to absolute immunity with regard to Destek's claims against them in their individual capacities.

### d.  Destek's claims for prospective injunctive relief against the Commissioners

Destek seeks prospective injunctive relief pursuant to § 1983 to compel the Commissioners to comply with the Telecommunications Act.  "[A] state official in his or her

official capacity, when sued for injunctive relief [is] a person under § 1983 because 'official capacity actions for prospective relief are not treated as actions against the State.'" Will, 491 U.S. at 71 n.10 (citations omitted). Accordingly, I deny the Commissioners' motion for summary judgment with respect to Destek's § 1983 claims for prospective injunctive relief.

### e. Conclusion

In summary, Verizon and the Utilities Commission are entitled to summary judgment with respect to all of Destek's claims against them. The Commissioners are entitled to summary judgment with respect to Count I and all of Counts II and III, except for Destek's claims for prospective injunctive relief under those two counts. Because Destek has asserted viable claims for prospective injunctive relief against the Commissioners in their official capacities, I turn to Destek's motion for summary judgment.

## C. Destek's Summary Judgment Motion

Destek moves for summary judgment only with regard to Count II of its amended complaint. It asserts in this count that the Commissioners violated the Telecommunications Act by: (1) failing

to treat the ATM Contract as an interconnection agreement that the Commission must approve or reject pursuant to § 252(e)(1) of the Act; and (2) failing to make a complete copy of the ATM Contract available for public inspection as is required by § 252(h) of the Act. Destek also argues that the Commissioners' use of N.H. Rev. Stat Ann. § 378:18 to avoid its obligations under §§ 252(e)(1) and 252(h) violates § 253(a) of the Act which provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). I decline Destek's request for summary judgment as to these claims because facts material to the question of whether the ATM Contract is an interconnection agreement subject to §§ 252(e) and 252(h) remain in genuine dispute.

1.  **Background**

An interconnection agreement is (1) an agreement between an (2) ILEC and a (3) telecommunications carrier regarding (4) the provision of interconnection services. See 47 U.S.C. §§ 252(a)(1), (e)(1). In this case, the parties' primary disagreement is whether the University is, in fact, a

-26-

telecommunications carrier.

As noted above, a "telecommunications carrier" is "any provider of telecommunications services" other than an aggregator of such services.  47 U.S.C. § 153 (44).  The Act defines "telecommunications service" to mean "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  Id. § 153(46); see id. § 153(43) (defining "telecommunications").

The Federal Communications Commission ("FCC"), relying on the legislative history of the Telecommunications Act, has interpreted the statutory term "telecommunications service" to mean telecommunications provided on a common carrier basis.  See, e.g., In re Federal-State Joint Bd. on Universal Serv., FCC 99-268, 1999 WL 809480, at ¶ 13 (released Oct. 8, 1999); In re AT&T Submarine Sys., Inc., FCC 98-263, 1998 WL 709391, at ¶ 6 (released Oct. 9, 1998); In re Cable & Wireless, PLC, FCC 97-204, 1997 WL 339269, at ¶ 13 (released June 20, 1997).  The Court of Appeals for the District of Columbia Circuit has accepted this interpretation.  Virgin Islands Tel. Corp. v. FCC, 198 F.3d 921, 926-27 (D.C. Cir. 1999) (concluding that the FCC's interpretation

of the term "telecommunications service" constituted a "permissible construction" of the Telecommunications Act). Because I find the opinion of the District of Columbia Circuit to be persuasive, I also accept the FCC's determination that the term telecommunications service means telecommunications provided on a common carrier basis. See id. Accordingly, in order to determine whether the University is a telecommunications carrier, I must ascertain whether it provides telecommunications services on a common carrier basis.

The Telecommunications Act defines a "common carrier" as "any person engaged as a common carrier for hire." 47 U.S.C. § 153(10); see 47 C.F.R. § 21.2 (2000) (defining the term "communication common carrier" to mean "[a]ny person engaged in rendering communication service for hire to the public"). Because of the circular nature of this definition, the federal courts have developed, and the FCC has accepted as controlling, a two-part test for determining whether an entity is a common carrier. See Nat'l Ass'n of Regulatory Utility Comm'rs. v. FCC, 533 F.2d 601, 608-10 (D.C. Cir. 1976) ("NARUC II"); Nat'l Ass'n of Regulatory Utility Comm'rs. v. FCC, 525 F.2d 630, 640-42 (D.C. Cir. 1976) ("NARUC I"); In re Cable & Wireless, PLC, FCC 97-204,

1997 WL 339269, at ¶¶ 13-17 (applying the test set forth in <u>NARUC I</u>); <u>see also</u> <u>FCC v. Midwest Video Corp.</u>, 440 U.S. 689, 701, 701 n.10 (1979) (acknowledging the "circularity" of the statutory definition and citing <u>NARUC I</u> with approval).

Under this rubric, I first ask whether the University "undertakes to carry for all people indifferently." <u>NARUC I</u>, 525 F.2d at 641 (internal quotation marks and citations omitted). I must consider whether the University is under any "legal compulsion . . . to serve indifferently those who seek to avail themselves of [its] particular services." <u>Id.</u> at 642. I must also consider whether there are "reasons implicit in the nature of [the University's] operations to expect" it to hold itself out indifferently to the public. <u>Id.</u> at 642. That is to say, I must ask whether it is the University's practice to "serve all indiscriminately." <u>Id.</u> "[A] carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal." <u>Id.</u>[10]

---

[10] Because I conclude that Destek offers insufficient evidence to demonstrate that the University intends to "serve all indiscriminately," I need not analyze whether the University satisfies the second requirement for common carrier status: that all customers who utilize the University's ATM services may "transmit intelligence of their own design and choosing." <u>NARUC</u>

## 2. **Analysis**

Destek does not contend that the University is legally compelled to offer ATM services indifferently to the public. See NARUC I, 525 F.2d at 642. Thus, my analysis turns on whether there are "reasons implicit in the nature of [the University's] operations to expect" the University to offer ATM services indifferently to the public.[11] Id.

Destek offers two pieces of evidence to support its argument that the University is a telecommunications carrier: (1) the ATM Contract itself; and (2) the affidavit of Destek's President, Brian Susnock.

### a. **The ATM Contract**

Destek argues that "the plain words of the [ATM Contract] establish that [the University is] a telecommunications carrier." Destek's Mem. of Law in Opposition to Verizon's Mot. for Summ. J., etc. ("Destek's Mem. of Law"), (Doc. No. 39), at 19. I disagree.

_____

II, 533 F.2d at 609 (internal quotation marks and citations omitted); see also Midwest Video Corp., 440 U.S. at 701.

[11] I assume for purposes of discussion that ATM technology is a form of "telecommunications," as defined by the Telecommunications Act. See 47 U.S.C. § 153(43).

While the ATM Contract does not prohibit the University from reselling ATM services to others for a fee, it does not state that the University intends to do so. Moreover, the mere fact that the University has the ability to offer ATM services to the public does not necessarily mean that it will offer those services indiscriminately.[12] See NARUC I, 525 F.2d at 641-42.

Indeed, in their submissions to the Utilities Commission, Verizon and the University suggested that it was the University's intent to offer ATM services only to its various campuses and to other public educational institutions, such as libraries and schools. See Verizon Transmittal Letter. Under those circumstances, the University would not be a common carrier. See NARUC I, 525 F.2d at 641-42; In re Federal-State Joint Bd. on

_____

[12] In this regard, I note that the Utilities Commission, in denying the various motions for reconsideration, observed that the ATM Contract is

> between a local exchange carrier (LEC) and a customer; what that customer does with the service provided is a concern of the [Utilities Commission] only if [the University] chooses to resell the services. Here, [the University] is simply providing a service to its remote "campuses" which happen to be located in various schools, libraries and other locations.

Order Denying Reconsideration at 14.

-31-

Universal Serv., FCC 99-268, 1999 WL 809480, at ¶ 13 (holding that a state network providing telecommunications services to state agencies and other public entities did not hold itself out indifferently to all potential users). The ATM Contract thus does not establish Destek's claim that the University is a telecommunications carrier because it offers telecommunications on a common carrier basis.

### b. **The Susnock Affidavit**

The only other evidence that Destek offers to support its argument that the University is a telecommunications carrier is the affidavit of Brian Susnock, Destek's President. His affidavit states as follows:

> Since the approval of the [ATM Contract], [the University] has marketed its ATM networking services to Destek's customers, and generally to businesses, schools and nonprofit entities throughout New Hampshire and Southern Maine.

Aff. of Brian Susnock, Exh. F to Destek's Mem. of Law, at ¶ 4; see also Letter from Susnock to Utilities Commission of 09/29/1999, App., Tab 20 ("Based on information we have just received, it is obvious that [Verizon] and [the University] plan to sell ATM Services to commercial and corporate interests in New

Hampshire.").

Even if the statements contained in this affidavit are true, they are not sufficient to support a conclusion that the University offers ATM services on a common carrier basis, i.e., indifferently to the public. See NARUC I, 525 F.2d at 641-42. Indeed, the affidavit suggests that the University may be attempting to reach individual deals with specific potential customers. Under those circumstances, it would not be a common carrier. See Southwestern Bell Tel. Co. v. FCC, 19 F.3d 1475, 1481 (D.C. Cir. 1994) ("If the carrier chooses its clients on an individual basis and determines in each case whether and on what terms to serve . . . the entity is a private carrier" (internal quotation marks and citations omitted)); NARUC I, 525 F.2d at 641 ("a carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal").

Because Destek offers insufficient evidence to demonstrate that the University intends to offer ATM services on a common carrier basis, I cannot conclude that the University is a telecommunications carrier and that the ATM Contract is an interconnection agreement subject to the Telecommunications Act.

-33-

As facts material to these issues remain in genuine dispute, I deny Destek's motion for summary judgment. <u>See</u> Fed. R. Civ. P. 56(c); <u>Ayala-Gerena</u>, 95 F.3d at 94-95.

## IV. <u>CONCLUSION</u>

For the reasons discussed herein, I grant Verizon's motion for summary judgment, (Doc. No. 35), in its entirety and grant the Commission and the Commissioners' motion for summary judgment, (Doc. No. 42), in part. I deny Destek's motion for summary judgment, (Doc. No. 38).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

July 31, 2001

cc:  Eugene F. Sullivan III, Esq.
     Sean A. Lev, Esq.
     Thomas J. Donovan, Esq.
     Victor D. DelVecchio, Esq.