[Cite as *State ex rel. Yost v. Google, L.L.C.*, 2026-Ohio-2148.]

# IN THE OHIO COURT OF APPEALS
## FIFTH APPELLATE DISTRICT
## DELAWARE COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO EX REL. YOST | Case No. 25 CAE 08 0070 |
| Plaintiff - Appellant | Opinion And Judgment Entry |
| -vs- | Appeal from the Court of Common Pleas, Case No. 21 CV H 06 0274 |
| GOOGLE, LLC | Judgment: Affirmed |
| Defendant - Appellee | Date of Judgment Entry: June 8, 2026 |

**BEFORE:** Andrew J. King; Craig R. Baldwin; Robert G. Montgomery, Judges

**APPEARANCES:** JENNIFER L. PRATT, CHAD M. KOHLER, DAVID OPPENHEIMER, for Plaintiff-Appellant; MICHAEL R. GLADMAN, JUSTIN E. HERDMAN, MOLLY M. DENGLER, JOHN E. SCHMIDTLEIN, KENNETH C. SMURZYNSKI, GLORIA K. MAIER, for Defendant-Appellee.

*King, P.J.*

{¶ 1}   Plaintiff-Appellant, Attorney General Dave Yost, appeals the August 15, 2025 opinion and order of the Delaware County Common Pleas Court denying its motion for summary judgment and granting the motion for summary judgment filed by Defendant-Appellee, Google, Inc. This appeal asks whether Google's operation of its internet search engine constitutes a common carrier under Ohio common law. The trial court correctly concluded that it does not. We affirm the trial court.

## I. Procedural History

{¶ 2}   On June 8, 2021, the State filed a complaint against Google out of a concern that Google prioritized the information it provided that best boosted its bottom line

instead of providing the most useful and relevant information to the public. Count One sought a declaration that Google was a public utility/common carrier under Ohio common law. Count Two sought relief.

{¶ 3} On May 24, 2022, the public utility claim in Count One was dismissed under Civ.R. 12(B); the counts were then bifurcated. The first phase addressed whether Google satisfied the elements to be declared a common carrier; if so, the second phase would address any obligations to be imposed upon Google as a common carrier.

{¶ 4} Following discovery, each party filed motions for summary judgment on the common carrier claim in Count One. By opinion and order filed August 15, 2025, the trial court granted Google's motion for summary judgment and denied the State's motion for summary judgment. The trial court based its decision upon its findings on two elements of common carriage: the requirement that the carrier transport property and the requirement that the carrier hold itself out as providing its services "indifferently." In a lengthy opinion, the trial court found Google did not transport people nor did it transport product for others; Google does not transport information, the internet service provider ("ISP") does, i.e., cable and mobile companies. Further, the trial court found Google does not send search information indifferently as it differentiates the information it sends out based on several factors.

{¶ 5} The State filed an appeal with the following assignments of error:

I

{¶ 6} "THE TRIAL COURT ERRED IN GRANTING GOOGLE'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE STATE'S MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS THAT GOOGLE SEARCH DOES NOT TRANSPORT PROPERTY."

{¶ 7}  "THE TRIAL COURT ERRED IN GRANTING GOOGLE'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE STATE'S MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS THAT GOOGLE DOES NOT HOLD ITSELF OUT AS INDIFFERENTLY PROVIDING INFORMATION TO THE PUBLIC."

## II. Standard of Review

{¶ 8}  Summary judgment motions are to be resolved in light of the dictates of Civ.R. 56. Regarding summary judgment, the Supreme Court stated the following in *State ex rel. Zimmerman v. Tompkins,* 75 Ohio St.3d 447, 448 (1996):

> Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex. rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

{¶ 9}  In *Leech v. Schumaker,* 2015-Ohio-4444, ¶ 13 (5th Dist.), this court explained the following:

It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280 at 293: " * * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150.

{¶ 10} As an appellate court reviewing summary judgment motions, we stand in place of the trial court and review the issues de novo, under the same standards and evidence as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

### III. Material Undisputed Facts

{¶ 11} Google Search works as follows: users submit queries; Google's systems crawl only a small fraction of the web's estimated 100+ trillion pages, build proprietary indices, and, for each individual query, select, rank, filter, and format results into a unique Search Results Page ("SRP"). The SRP is Google's own curated product, not a passive transmission of third-party content. Initial transmission and final delivery from and to the user occurs over networks owned and operated by ISPs. Google's role is to receive the query and to respond to it as it sees fit.

{¶ 12} Google states that its ranking and presentation decisions involve editorial judgment based on relevance, quality, user context, and other proprietary signals. This makes each SRP unique. These facts are undisputed. *See* August 15, 2025 Opinion and Order at 2-4; Nayak Affidavit & Deposition; additional record citations omitted.

{¶ 13} The State argues Google "satisfies every element needed to be a common carrier of information. The information it carries, although intangible, is precious cargo to the users who seek it. Those users deserve the protection that the law affords to customers of common carriers. " Appellant's Brief at 26.

### IV. Historical Development of the Common Carrier Doctrine

{¶ 14} The common carrier doctrine is one of the oldest bodies of Anglo-American law. Its roots lie in medieval English "public callings" i.e., occupations whose very nature required service to all members of the public without discrimination. The first reported

case involved a ferryman in 1348. By the seventeenth century, the obligation extended to innkeepers, farriers, and carriers. *See Lane v. Cotton*, 1 Ld. Raym. 646 (1701). A contemporary commentator, Sir Matthew Hale (later named Lord Chief Justice of the King's Bench) wrote *De Portibus Maris* (c. 1670). He observed when private property is "affected with a public interest, it ceases to be *juris privati* only." Lord Chief Justice Hale's statement was later approvingly cited by the Supreme Court of the United States when it reviewed the issue of the constitutionality of regulating rates of certain businesses.

{¶ 15} In *Munn v. Illinois,* 94 U.S. 113 (1876), the Supreme Court upheld an Illinois statute fixing maximum rates for grain storage in Chicago warehouses, holding that when private property is devoted to a use in which the public has an interest, the owner may be forced to submit to regulation. The Court rejected the argument that such regulation violated the Fourteenth Amendment's Due Process Clause, affirming the state's broad police power to regulate businesses "affected with a public interest."

{¶ 16} Chief Justice Waite, writing for the majority, grounded the analysis in Lord Chief Justice Hale's centuries-old treatise *De Portibus Maris,* citing the aforementioned quote: when private property is "affected with a public interest, it ceases to be *juris privati* only." *Munn* at 126. The Court translated this principle into American constitutional law: "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large." *Id.*

{¶ 17} After extensively quoting from Lord Chief Justice Hale's treatise, the Court ruled thusly (*Id.* at 130):

> Common carriers exercise a sort of public office, and have duties to perform in which the public is interested. *New Jersey Nav. Co. v.*

*Merchants' Bank,* 6 How. 382. Their business is, therefore, "affected with a public interest," within the meaning of the doctrine which Lord Hale has so forcibly stated.

But we need not go further. Enough has already been said to show that, when private property is devoted to a public use, it is subject to public regulation.

{¶ 18} The Court went on to conclude that since every bushel of grain "pays a toll" that is a common charge, then it ought to be subject to public regulation that only a reasonable toll is to be extracted. *Id.* at 132. Although the legislature intervened rather than the judiciary, the Court found that to be without consequence; the doctrine applied the same. *Id.* at 132-133. Justice Field dissented, questioning in part whether the principles announced by Lord Chief Justice Hale applied in the case because the sovereign did not dedicate the channel of commerce, such as a warehouse, to the public, therefore, there was no basis to extend the common carrier doctrine to the business before the court. *Id.* at 151-152.

{¶ 19} Thus, after *Munn*, the doctrine had both established its constitutional blessing and had arguably expanded its reach, allowing for more legislative intervention. As this doctrine was applied in a myriad of contexts and to emerging technologies, the principle of non-discrimination emerged as a frequent judicial explanation for intervention; these courts usually held that common carriers must "serve the public without partiality and without unreasonable discrimination." *Pittsburgh, Cincinnati, Chi. & St. Louis Ry. Co. v. Wood*, 45 Ind.App. 1 (1909); *Montgomery Ward & Co. v. Northern Pacific Terminal Co.*, 128 F. Supp. 475 (D.Or. 1953); *National Asso. of Regulatory Utility*

*Comm'rs v. Federal Communications Com. (NARUC I),* 525 F.2d 630, 641 (D.C.Cir. 1976); *National Asso. of Regulatory Utility Comm'rs v. Federal Communications Com.,* 533 F.2d 601, 608 (D.C.Cir. 1976) ("the primary *sine qua non* of common carrier status is a quasi-public character, which arises out of the undertaking 'to carry for all people indifferently. . . .'"). But it is fair to say that legislation intervention has become more common.

{¶ 20} As new technologies and market conditions emerged, the doctrine adapted, primarily through legislative action. Railroads prompted the Interstate Commerce Act of 1887; telegraph and telephone companies were regulated under the Mann-Elkins Act of 1910 and the Communications Act of 1934 (Title II). Consumer protection concerns, particularly the need to curb monopoly power and combination that drove rates to excessive levels, supplied an important justification for rate regulation. *Munn*, 94 U.S. at 126, 130 (tracing early English statutes addressing carrier "combination" that raised prices "to the great injury of the trade").

{¶ 21} Ohio broadly follows this same pattern. The state courts recognize the authority of courts to intervene by way of the common carrier doctrine. The doctrine has been applied to neutral conduits that carry goods, passengers, or "messages" to do so with reasonable and nondiscriminatory rates. But much of the regulatory work is done under statutory authority given to regulatory agencies. For example, R.C. Ch. 4905 subjects many public utilities to PUCO oversight. The General Assembly has not extended common carrier or public utility obligations to search engines or similar application-layer services. Thus, we are limited to addressing the judiciary's authority to hear the complaint and fashion any appropriate remedy.

## V. Ohio's Common Carrier Test

{¶ 22} Ohio's common law definition of a common carrier is well-established. A common carrier is one who, as a regular business, undertakes for hire to transport persons or property from place to place and holds itself out to the public as ready and willing to serve all members of the public indifferently. *See, e.g., Samms v. Stewart & McKibben*, 20 Ohio 69 (1851); *Bruer v. Public Utils Com*, 118 Ohio St. 95 (1928), syllabus; *Conver v. EKH Co.*, 2003-Ohio-5033, ¶ 32 (10th District); August 15, 2025 Opinion and Order at 8-10 (collecting authorities).

{¶ 23} Two distinct elements must be satisfied: (1) the carrier element - actual transportation of the property (or persons) of others; and (2) the common element - holding out to serve the public indiscriminately. *See Kinder Morgan Cochin LLC v. Simonson*, 2016-Ohio-4647, ¶ 33 (5th Dist.) ("we find that common carrier is consistently defined as one who undertakes to transport persons or property from place to place, for hire, and holds itself out to the public as ready and willing to serve the public indifferently." (Internal quotation marks omitted.)  *See also NARUC I,* 525 F.2d 630 (D.C.Cir. 1976) (persuasive federal articulation of the same longstanding test).

## VI. Application

### A.  Google Does Not "Transport" the Property of Others
### (The Carrier Prong)

{¶ 24} Typically, when we are considering the carrier prong, we are asked to review the transportation of property or people. That is not the case here. As discussed in several of the cases cited above, a carrier handles the property akin to a bailment. It is simply moving it from one place to another. At its most general, the core concern of this prong is

receiving the property of another and returning it unaltered after transporting it or transporting a person from one point to another.

{¶ 25} Based on the facts before us, we conclude that Google does not transport the unaltered property of others. It affirmatively creates a new expressive product, the SRP, through discretionary crawling, indexing, ranking, filtering, and formatting. This is curation and synthesis, not carriage. The trial court correctly rejected the State's attempt to treat underlying "information" as the transported property. *See Richards v. Google LLC*, 2026 U.S. Dist. LEXIS 26279 (W.D.Va. 2026); *Zhang v. Baidu.Com Inc.*, 10 F.Supp.3d 433 (S.D.N.Y. 2014).

{¶ 26} The State's analogy to telephone service breaks down when one examines the actual flow of data. A user sends a query to Google; that query is a simple request consisting of the user's own words or terms. Even assuming arguendo that Google has some common law duty to transmit the incoming query fairly and unaltered, the State's complaint centers on the return leg - the SRP Google delivers back to the user.

{¶ 27} That return data is not the user's property, nor is it third-party content transmitted unaltered. Google receives the query, consults its own proprietary indices, applies its own ranking algorithms, makes relevance and quality judgments, filters results, and assembles a new, curated response that did not previously exist in that form. The SRP is Google's own expressive product, not the user's or any third party's property being carried back unaltered. Traditional common carriers do not create the cargo they transport; they accept the shipper's or speaker's existing goods or message and deliver them substantially as received. Google does neither on the return leg.

{¶ 28} We acknowledge the test announced in *Munn* is plainly broader than how Ohio courts have looked at the question of judicially regulating a common carrier. In

finding that the state could regulate the rates charged to store grain, it relied on a much broader standard. There, the Court held that if a business had taken on a public character, it was then susceptible to legislative oversight. But here there is neither a statute for us to consider, nor did the Attorney General ask us to displace our precedent and expand the scope of our judicial power over common carriers. Moreover, we observe that the Ninth Circuit questioned the application of the common carrier doctrine to Google Gmail, which appears to function more like a common carrier than Google's search function. *Republican Nat'l Comm. v. Google, Inc.*, 2026 U.S. App. LEXIS 1192 (9th Cir. Jan. 16, 2026).

{¶ 29} Thus, we find it necessary and appropriate to consider whether Google's search service meets the carriage prong. We hold it does not; thus, the trial court properly held that Google fails the carrier prong on the undisputed facts.

## B. Google Does Not Hold Itself Out to Serve the Public Indifferently (The Common Prong)

{¶ 30} Perhaps the most defining characteristic of common carrier status, in all its forms, has been the obligation to serve the public without unjust discrimination, or stated in the affirmative: to provide the service on indifferent terms. *NARUC I*, 525 F.2d at 641. Historically, the primary remedy associated with this obligation was judicial or regulatory oversight to ensure that rates were reasonable, properly differentiated according to cost and competitive conditions, and free from unjust or arbitrary discrimination. *See Munn*, 94 U.S. 113. We turn now to that consideration.

{¶ 31} Google's pervasive presence in modern life is undeniable. For many Ohioans, Google Search is the de facto gateway to information. Even assuming for the sake of argument that Google's Terms of Service would not, by themselves, justify refusing

certain user inputs (queries), the Attorney General's concern lies primarily with outputs - the ranking, presentation, and curation of search results.

{¶ 32} At this point the common carrier doctrine encounters a fundamental mismatch. Traditional common carrier regulation centers on the relationship between price and service. Courts and regulators assess whether rates are just and reasonable. Google, however, provides its core search service to users at no direct charge. Its revenue comes overwhelmingly from advertising, not from the users whose results the State seeks to regulate. There is no traditional "rate" for the court to review or adjust. Scholarship in this area often concludes classic common carrier rate regulation is poorly suited to two-sided, zero-price-to-user, innovation-driven markets; any nondiscrimination obligation imposed here would necessarily target the content and ordering of outputs rather than prices, raising a distinct and more constitutionally sensitive set of issues.[1]

{¶ 33} Thus, even if one were to accept the State's position that Google qualifies as a common carrier, fashioning an appropriate remedy would take this Court far outside the traditional judicial role in common carrier cases. The common law of common carriers does not supply a ready template for regulating the editorial output of a free service whose business model does not depend on user payments. The trial court concluded correctly

---

[1] *See generally* Joint Economic Committee of the U.S. Senate, *The Economics of Price Controls* (Sept. 2022), https://www.jec.senate.gov/public/_cache/files/7171cb80-ef0d-4058-b3e6-f20fe608745f/the-economics-of-price-controls-final-092122.pdf (accessed May 2026) (summarizing economic literature showing price ceilings cause shortages, reduce quality/innovation, and distort investment — principles that apply with even greater force to zero-price, two-sided digital markets); *see also* George J. Stigler & Claire Friedland, *What Can Regulators Regulate? The Case of Electricity,* 5 J. L. & Econ. 1 (1962) (classic empirical study questioning efficacy of rate regulation even in natural-monopoly settings).

that Google does not hold itself out to serve the public indifferently in the sense required by the common carrier doctrine.

## C. Ubiquity, Monopoly Power, and the "Affected with a Public Interest" Doctrine

{¶ 34} The State argues that Google's search engine has become so ubiquitous and central to modern life that its business is "affected with a public interest" in the sense articulated by Lord Chief Justice Hale and the Supreme Court in *Munn*. There is no question that Google Search exerts enormous influence over the flow of information. Consumer protection and monopoly concerns have historically justified regulation of true common carriers.

{¶ 35} However, the "affected with a public interest" principle supplies a constitutional justification for legislation and regulation; it does not dispense with the common carrier doctrine's two core requirements for judicial intervention. As stated above, the Attorney General did not ask us to abandon the common carrier standard altogether. Even if he had, we would be cautious in accepting the invitation. The essence of the judiciary is to resolve disputes between the parties and not to engage in extensive, top-level policy making that the legislative branch is better equipped to handle. Even if the judiciary were to accept the responsibility for determining what businesses affected the public interest so profoundly that they lost their purely private status, the next step would be how to do this within the confines of the now well-established complaint, answer, discovery, and judgment continuum. In this system, the parties are bringing us disputes, providing us with the facts, and arguing the law. This necessarily leads to more modest pronouncements on any given subject matter than what the legislature may accomplish with legislation.

{¶ 36} It appears that the Attorney General singled out Google because of its monopoly-like status in this field. But ubiquity and market share do not justify novel judicial intervention here. *Munn* supplied a constitutional justification for legislative intervention in a natural-monopoly setting; it did not authorize courts to judicially impose common carrier status on new technologies whose core function is editorial curation rather than neutral transport. Although some scholars contend that dominant platforms satisfy the common law elements of holding themselves out to serve the public and operating facilities affected with a public interest, the editorial and curatorial nature of search results, as opposed to neutral transmission of others' unaltered messages or property, distinguishes this service from traditional common carriage.[2]

{¶ 37} If the General Assembly concludes that search engines warrant public utility style oversight due to their market position, it may enact appropriate legislation as it has done for other industries. This Court will not accomplish by judicial fiat what the legislature has not chosen to do. We therefore decline to adopt a broader judicial regulation under the *Munn* standard.

## VII. Additional Considerations

### (A) Federal Preemption

{¶ 38} There are alternative reasons to decline judicially regulating search engines as the Attorney General requests. We briefly look to these and conclude that there are additional reasons not to pursue *Munn*-style intervention in this case. Foremost is that treating search engines as common carriers under state law would raise serious questions of conflict with federal communications policy. Congress and the FCC have long

---

[2] Ganesh Sitaraman & Morgan Ricks, *Tech Platforms and the Common Law of Carriers,* 73 Duke L.J. 1037 (2024).

distinguished "information services" (a category that includes search engines) from traditional telecommunications services subject to common carrier regulation. *See* 47 U.S.C. 153(24); *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C.Cir. 2019). We could easily undertake the vain effort to regulate Google under state common carrier law, only to have that effort blocked by federal law. *See, e.g., State ex rel. Att'y Gen. Dave Yost v. Cent. Tobacco & Stuff, Inc.,* 2025-Ohio-4613 (5th Dist.).

## (B) First Amendment Implications

{¶ 39} Aside from the preemption issue under the Supremacy Clause, we would also need to be mindful of the First Amendment. The undisputed facts and the State's legal arguments make clear that the core concern underlying this litigation is the regulation of Google's editorial judgments in curating, ranking, and presenting information. This is, at bottom, an attempt to regulate speech.

{¶ 40} We do not discount the legitimate policy concerns that animate the State's position. Google's dominant market position gives it outsized influence over the modern public square. Congressional investigations and disclosures regarding government-platform communications have raised serious questions about content moderation practices, viewpoint discrimination, and the influence of dominant technology platforms.[3] These issues may indeed support a compelling governmental interest in narrowly tailored legislation designed to promote transparency or address demonstrable harms.

---

[3] *See Final Report: The Weaponization of the Federal Government,* Select Subcommittee of the Committee on the Judiciary, U.S. House of Representatives, 118th Cong. (2024) https://judiciary.house.gov/media/press-releases/final-report-weaponization-federal-government (accessed June 2026) (documenting extensive government communications with Twitter regarding content moderation and suppression of accounts and viewpoints).

{¶ 41} But the ancient common carrier doctrine is not the proper vehicle for addressing these concerns. Imposing common carrier obligations on Google's search functions would necessarily compel the company to carry, rank, or display speech it would otherwise choose to de-emphasize or exclude — precisely the type of editorial discretion the First Amendment protects when exercised by private entities compiling and presenting third-party speech. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241 (1974). The same protections exist under Article I, Section 11 of the Ohio Constitution.

{¶ 42} Extending common carrier status here would not avoid First Amendment scrutiny; it would trigger it. Because Google's search results are its own expressive product rather than neutral carriage, the common carrier doctrine does not fit this business model. Any broader regulatory response belongs to the legislative branch. Avoiding an apparent constitutional question is yet another reason to stay within our two-prong common carrier test rather than recast it as a more encompassing tool under *Munn*.

## VIII. Conclusion

{¶ 43} Google Search is not a common carrier under Ohio common law. It fails under either prong of our traditional test. While the Attorney General points to facts such as monopoly power and suggests a more robust judicial intervention is required, we decline to depart from our precedent. Among other reasons, the apparent preemption and free speech issues, together with the expressive character of search outputs under the *Munn* framework, counsel against departing from our traditional two-prong test. *See State v. Striblin,* 2024-Ohio-2142, ¶ 22. (5th Dist.).

{¶ 44} This conclusion is consistent with the historical limits of the common carrier doctrine, the practical mismatch between traditional rate regulation and modern

platform economics, and the judiciary's proper role in deferring complex policy choices involving speech and technology to the legislative branch. We, therefore, affirm the judgment of the Delaware County Court of Common Pleas.

{¶ 45} Costs to Appellant.

By: King, P.J.

Baldwin, J. and

Montgomery, J. concur.